**Charles BAKER, Plaintiff,**

v.

**CANADIAN NATIONAL/ILLINOIS CENTRAL RAILWAY COM- PANY, Defendant.**

**No. CIV.A. 3:03CV905LN.**

United States District Court,
S.D. Mississippi,
Jackson Division.

July 13, 2005.

Michael Todd Blotevogel—PHV, Michael Todd Blotevogel, Attorney, Roy Cameron Dripps—PHV, Lakin Law Firm, Wood River, IL, Andre F. Ducote, Lundy & Davis, L.L.P., Jackson, MS, for Plaintiffs or Petitioners.

Bridget E. King, Wise, Carter, Child & Caraway, Benjamin Noah Philley, Wise, Carter, Child & Caraway, George H. Ritter, Wise, Carter, Child & Caraway, Charles H. Russell, III, Wise, Carter, Child & Caraway, Jackson, MS, for Defendants or Respondents.

### MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

There are pending in this cause several motions that are now fully briefed and ripe for consideration, including:

(1) Defendant Canadian National/Illinois Central Railway Company's motion for summary judgment, or in the alternative, for partial summary judgment;

(2) Plaintiff Charles Baker's motion for partial summary judgment;

(3) Defendant's *Daubert* motion to exclude testimony of plaintiff's expert Edward Stanton;

(4) Defendant's *Daubert* motion to exclude the testimony of plaintiff's expert James R. Loumiet;

(5) Plaintiff's motion to exclude certain testimony from defendant's expert Mike McDonald; and

(6) Plaintiff's motion to exclude certain testimony from defendant's expert Stephen Chewning.

*The Accident*

This case arises out of a grade crossing accident that occurred on June 27, 2000 in Hinds County, Mississippi. On that date, plaintiff Charles Baker was working as a dump truck driver for Hancock Construction, which had been hired by Illinois Central to remove vegetation and earth located near the Greens Road railroad crossing. Baker and other truck drivers were responsible for hauling away loads of vegetation, dirt and other debris removed by other members of the Hancock crew from the site and transporting them to a nearby dump, located somewhere on the other side of the tracks. The accident at issue occurred when Baker was proceeding from the worksite with his loaded truck. As Baker entered the crossing heading east toward the dump, his truck was struck by a northbound freight train, resulting in injury to Baker.

*Plaintiff's Complaint*

Plaintiff has set forth multiple allegations of negligence stemming from the accident. He alleges that the train crew was negligent in failing to keep a reasonable and proper lookout; in failing to keep the train under proper and reasonable control; in failing to adequately warn of the train's approach as required by Mississippi Code Annotated § 77-9-225; and in operating the train at an excessive rate of speed under the circumstances. He further alleges that Illinois Central was negligent because the train crossing was "extra hazardous," thereby requiring additional warning devices to warn motorists of approaching trains. Finally, he alleges that the work he was performing on the date of the accident fell under the Roadway Worker Protection Rules codified at 49 C.F.R. § 217.4, and that therefore, Illinois Central should have had a flagman on duty at the job site to warn Baker of approaching trains.

*Defendant's Answer*

In its answer and counterclaim, Illinois Central denies that it was negligent in causing or contributing to the subject collision. It maintains that its employees used due care in operating the train, that the subject crossing was reasonably safe for motorists exercising reasonable care for their own safety, that there was more than adequate sight distance for Baker to be able to see an oncoming train and to stop in time to avoid the collision, and that the accident was caused solely by Baker's negligence in failing to exercise reasonable care for his own safety.

*Cross–Motions for Summary Judgment: Roadway Worker Protection Rules*

Plaintiff's motion for summary judgment seeks to impose liability on Illinois Central for its alleged failure to comply with the Roadway Worker Protection Rules. Defendant disputes that these rules are applicable and has so contended in its own motion for summary judgment. The court, having considered the parties' arguments and reviewed the record evidence, finds that it is unable to determine from the undisputed facts of record whether these rules apply and therefore, plaintiff's motion for summary judgment will be denied as will defendant's motion as it pertains to plaintiff's allegations that the

Roadway Worker Protection Rules were violated.

The Roadway Worker Protection Rules (RWPR), which became effective in January 1997, were promulgated under § 8 of the Rail Safety Enforcement and Review Act, 49 U.S.C. § 20142. The rules require that each railroad devise and adopt a program of on-track safety to protect employees working along the railroad, i.e., "roadway workers," from the hazards of being struck by a train or other on-track equipment. 49 C.F.R. § 214.301 (express purpose of rules is "prevent[ing] accidents and casualties caused by moving railroad cars, locomotives or roadway maintenance machines striking roadway workers or roadway maintenance machines.").[1] The RWPR defines "roadway worker" to mean

> any employee of a railroad, or of a contractor to a railroad, whose duties include inspection, construction, maintenance or repair of railroad track, bridges, roadway, signal and communication systems, electric traction systems, roadway facilities or roadway maintenance machinery on or near track or with the potential of fouling a track, and flagmen and watchmen/lookouts as defined in this section.

49 C.F.R. § 214.7. "Fouling a track" is defined to mean

> the placement of an individual or an item of equipment in such proximity to a track that the individual or equipment could be struck by a moving train or on-track equipment, or in any case is within four feet of the field side of the near running rail.

*Id.* 49 C.F.R. § 214.335(a) provides that

> No employer subject to the provisions of this part shall require or permit a roadway worker who is a member of a roadway work group to foul a track unless on-track safety is provided by either working limits, train approach warning, or definite train location in accordance with the applicable provisions of §§ 214.319, 214.321, 213.323, 214.325, 214.327, 214.329 and 214.331 of this part.

Illinois Central maintains that RWPR does not apply and Baker does not fall within the class of persons protected by RWPR because he did not meet the definition of roadway worker fouling the tracks for two reasons.[2] First, on the date of the accident, neither Baker nor any of his coworkers were performing any work on any "railroad track, bridges, roadway, signal and communications systems, electric traction systems, roadway facilities or roadway maintenance machinery;" rather, they were merely working to clear the right-of-way. Second, while Baker did go onto the tracks when his vehicle entered the crossing, at the time he went onto the tracks, he was simply a private motorist on a public road. That is, once Baker pulled onto the public road, leaving the defendant's right-of-way, he was a private motorist approaching a public crossing and as such, was entitled to no more or less pro-

---

1. Pursuant to the directive in The Rail Safety Enforcement and Review Act of 1992 that the Secretary of Transportation review and revise federal rules relating to railroad track safety, 49 U.S.C. § 20142, the Federal Railway Administration conducted a study and found that from 1989 to 1993 twenty-two roadway workers were struck and killed by trains or on-track equipment. This finding prompted the formation of a federal advisory committee which formulated the rules for worker safety which are the RWPR. *See Association of*

*American Railroads v. Department of Transp.,* 198 F.3d 944, 946, 339 U.S.App.D.C. 197, 199 (C.A.D.C.1999); *see also* 49 C.F.R. §§ 214.301–214.355.

2. The parties apparently agree that if the rules apply, they were violated, for it is undisputed that Illinois Central took no extra precautions to protect Davis and his coworkers from injuries caused by moving trains.

tection than any other motorist on a public road.

■ In support of the first of these arguments, defendant insists that the term "roadway" in the RWPR is not synonymous with "right-of-way"; rather, "roadway" refers to "the area on which the railroad constructs its road-bed and lay[s] its tracks." *See CSX Transp., Inc. v. Chicago and North Western Transp. Co.,* 1994 WL 406546 (N.D.Ill.1994). In the court's opinion, however, the more reasonable interpretation of the term roadway, as used in the RWPR, includes not only the roadbed, but also the right-of-way, given that the RWPR is broadly designed to protect those whose duties for and on behalf of the railroad would place them in such proximity to the tracks as to put them at risk of injury from moving trains or railway equipment.[3] Whether the work being performed by Baker and his coworkers qualifies in that respect, however, is another matter.

The evidence, including photographic evidence of the worksite, seems to indicate that the Hancock workers, while doing the actual clearing work, were physically locat-ed in an area thirty to eighty feet from the railroad tracks and thus while doing that work, were not likely to foul the tracks. Plaintiff, though, argues that there was a clear potential for fouling the track, in at least three ways. First, he notes that the boom on a trackhoe that was being used by the Hancock crew to excavate dirt and debris could have swung within four feet of the track; yet plaintiff's proof as to this assertion is merely speculative.[4]

His main argument, though, is that he not only had the potential to foul the track, but actually did foul the track when he attempted to cross it in his truck and was struck by the train. Baker submits that when this occurred, he was still performing work in furtherance of maintaining the right-of-way in that he was transporting dirt and debris from the site, as was his charge, and he therefore insists he was entitled to RWPR protections when he undertook to cross the tracks.

For its part, Illinois Central reiterates that once Baker pulled onto the public road, leaving defendant's right-of-way, he was no longer a "roadway worker" entitled

---

3. Illinois Central points out that Baker has "failed to cite any binding authority in which an independent contractor working 30–80 feet from a public railroad crossing clearing vegetation is considered a roadway worker subject to the protection of the RWPR." Yet neither has Illinois Central offered any binding authority in support of its position. The fact is, there is scant authority interpreting the RWPR and none addressing the specific question here presented. It is not surprising, then, that neither side has offered any "binding authority" in support of their respective positions.

The court further notes that it has reached its conclusions regarding the RWPR without reference to the opinions offered by plaintiff's expert, Edward Stanton, or by defense expert Mike McDonald as to the proper interpretation of the RWPR. Thus, the question whether either of these experts' opinions on this point should be stricken, as contended by the parties in their respective motions to exclude these experts' testimony, is essentially moot.

4. The regulations do contemplate that a person working more than four feet from the track may "still be fouling the track if the person's expected or potential activities or surroundings could cause movement into the space that would be occupied by a train." 61 Fed.Reg. 65969 (Dec. 16, 1996). Here, although plaintiff's expert, Edward Stanton, suggested that the boom of the trackhoe could have fouled the track, he admitted he had made no measurements and thus did not know whether it was ever situated close enough to the track for the boom to have extended into the foul space.

The court notes that defendant has moved to exclude Stanton's testimony in this regard and for the reason given, this motion is well taken.

to RWPR protection (assuming he ever was) but rather at that point became a private motorist approaching a public crossing entitled to no greater protection than any other motorist. Indeed, it notes in this regard that if Baker's theory were accepted, railroads would have the unbearable, and obviously unintended burden of providing RWPR protection to workers working far away from their tracks when those workers, in the course of their workday, have to drive across a public grade crossing. The court fully concurs with defendant that this was not intended by the RWPR. Rather, while a railroad would be required to provide on-track safety for any roadway worker required to cross the tracks on railroad property, i.e., other than at a public crossing, reason strongly dictates that a roadway worker, when traversing a public highway and approaching a public crossing, is a member of the motoring public, and no longer in need of the special protections afforded to him in his capacity as a roadway worker.

Having said that, there appears to be a conflict in the evidence relating to the question whether Baker was able to and whether he did pull onto the road so that he could approach the crossing as would any other motorist. In this vein, defendant's experts have testified based on photographs taken on the day of the accident which purport to depict the worksite that Baker had ample room to drive fully onto the public road and pull up to the stop sign. Other witnesses have indicated that the photographs were taken later in the day and do not accurately depict the loca-

tion of the work at the time of the accident, and Baker has himself testified that there was not enough room for him to pull all the way onto the road to approach the crossing and that he instead had to approach the crossing at an angle that prevented his being able to have a clear view to the south.

In the court's opinion, if the location and configuration of the worksite in relation to Greens Road and the subject crossing was such as to prevent Baker from being able to pull fully onto the road and approach the crossing at the same 90 degree angle as any other driver and instead was such as to require that he approach the crossing at a 45 degree angle which would have obscured his view of the tracks to the south, then the RWPR would arguably apply.[5] Practically, to put a worker in this position is little different from requiring a worker to traverse the tracks at a point where there is no recognized crossing. This puts him at greater risk than members of the motoring public and in the court's view, would entitle him to the protection of the RWPR.

Therefore, in view of the disputed facts, the court concludes that plaintiff's motion for partial summary judgment should be denied as should defendant's summary judgment motion on this issue.

*Defendant's Motion for Summary Judgment*

Illinois Central contends that summary judgment is in order as to all plaintiff's remaining allegations.

---

**5.** In the court's opinion, if it was reasonably possible for Baker to have pulled onto the road to approach the crossing, then this is what the law would have required of him. *See* 49 C.F.R. 214.313(b) ("A roadway worker shall not foul a track except when necessary for the performance of duty."). The court would further note that the RWPR requires

that before fouling a track, a roadway worker "is responsible to ascertain that on-track safety is being provided." 49 C.F.R. § 214.313(c). Inasmuch as it is undisputed that no on-track safety was provided, it would seem that Baker could not have ascertained that on-track safety was being provided.

If the RWPR were ultimately found to be applicable, then Illinois Central's duties to plaintiff would be determined by reference to those rules, rather than to the rules and principles applicable to members of the motoring public. On the other hand, if the RWPR were inapplicable, then the duties owed to Baker would be those owed to members of the motoring public, and the viability of plaintiff's claims would be gauged by reference to such rules and principles. The following, therefore, for ease of discussion, assumes inapplicability of the RWPR.

1. *Alleged Negligence by the Train Crew:*

A. *Failure to Provide Audible Warning*

■ Illinois Central has argued, and has presented ample supporting evidence that, as required by law, the train crew began sounding the train's horn or bell prior to the whistle board, which was located 930 feet south of the crossing, and that they continuously sounded the horn or bell until the point of impact. *See* Miss.Code Ann. § 77–9–255 (providing that a train crew approaching a public crossing is required to sound the train's horn or bell 900 feet at repeated intervals prior to the crossing). Plaintiff has offered no contrary proof, and has, in effect, conceded that summary judgment is in order as to his allegation that defendant violated § 77–9–255.

B. *Failure to Maintain a Proper Lookout*

■ Plaintiff has also effectively conceded defendant's motion to the extent it seeks summary judgment on his allegation that the train crew failed to maintain a reasonable and proper lookout and to keep the train under reasonable and proper control. In support of its motion, Illinois Central has presented the affidavit of the train's engineer, Richard Dunn, who states that he maintained a constant lookout in front of the train as it approached the crossing and that he did see plaintiff's dump truck as it approached the crossing, but that he expected it to stop at the stop sign and yield to the approaching train as required by Mississippi law. *See* Miss. Code Ann. § 77–9–249 (setting forth duty of motorist to stop at crossing when train is approaching); *Woods v. Amtrak,* 982 F.Supp. 409 (N.D.Miss.1997) (finding no duty to stop or slow the train for approaching vehicle as "engineer was entitled to assume that the plaintiff would stop for an approaching train"); *Wilner v. Mississippi Export R. Co.,* 546 So.2d 678, 681–82 (Miss.1989) (holding that railroad was entitled to assume that approaching motor vehicle drivers would slow sufficiently to see whether or not a train was on or near the crossing). Moreover, defendant has offered uncontroverted proof that once it became apparent to Dunn that Baker was not going to stop, there was not sufficient time to measurably slow or stop the train prior to impact.

In view of these undisputed facts, the court concludes that summary judgment is proper on plaintiff's claims for negligence in failing to maintain a proper lookout and to maintain the train under reasonable control.

C. *Excess Train Speed and Failure to Slow/Stop Train*

■ It is undisputed that the subject train was running between 55–58 miles per hour as it approached Greens Road crossing and thus was traveling within the applicable federal speed limit. Nevertheless, plaintiff maintains that Illinois Central was negligent in not issuing a slow order in view of the work that was being performed by the Hancock crew in the vicinity of the tracks on the date of the accident. In the

court's opinion, plaintiff's claim in this regard is preempted by the Federal Railroad Safety Act (FRSA). Congress enacted the FRSA "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. The Act, which authorizes the Secretary of Transportation "to prescribe regulations and issue orders for every area of railroad safety," 49 U.S.C. § 20103(a), contains an express preemption clause which provides:

> Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement.

49 U.S.C. § 20106. The statute has a savings clause which provides:

> A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety when the law, regulation, or order—
>
> (1) is necessary to eliminate or reduce an essentially local safety hazard;
>
> (2) is not incompatible with a law, regulation, or order of the United States Government; and
>
> (3) does not unreasonably burden interstate commerce.

*Id.* In *CSX Transportation, Inc. v. Easterwood,* 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993), the Supreme Court noted that the Secretary of Transporta-

tion, after taking into account the hazards posed by track conditions, set maximum allowable operating speeds for all trains for each class of track and those federal regulations substantially subsumed the subject matter of the relevant state law. *Id.* at 673–75, 113 S.Ct. at 1743 (citing 49 C.F.R. § 213.9(a) (1992)). The Court thus held that a claim that defendant's train was traveling at an excessive speed, given the time and place, was preempted. *Id.* at 675, 113 S.Ct. at 1743–44. That is, the Court held that the speed limits established by the Secretary of Transportation must be read "as not only establishing a ceiling, but also precluding additional state regulation based on common law speed restrictions." *Id.* at 673, 113 S.Ct. at 1743. In accordance with *Easterwood,* therefore, "[c]laims for excessive speed are preempted if the train is indisputably traveling within the federal speed limit set for that particular class of track." *Stuckey v. Illinois Central R. Co.,* 1998 WL 97270, *5 (N.D.Miss.1998) (citing *Easterwood* ).

Although the Court in *Easterwood* found that excessive speed claims are preempted, the Court noted that "related tort law duties, such as the duty to slow or stop a train to avoid a specific, individual hazard" might not be preempted, 507 U.S. at 675 n. 15, 113 S.Ct. at 1743 n. 15, though it declined to address "the question of FRSA's pre-emptive effect on such claims," [6] *id.,* 113 S.Ct. at 1743 n. 15. In *Hesling v. CSX Transportation, Inc.,* the Fifth Circuit observed that

> [t]he term specific, individual hazard means a "discrete and truly local hazard." *Seyler v. Burlington N. Santa Fe*

---

**6.** The Court stated:

> [T]he pre-emption of respondent's excessive speed claim does not bar suit for breach of related tort law duties, such as the duty to slow or stop a train to avoid a specific, individual hazard ... As respondent's complaint alleges only that petitioner's train was traveling too quickly given the "time

and place" ... this case does not present, and we do not address, the question of FRSA's pre-emptive effect on such related claims.

*CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 675 n. 15, 113 S.Ct. 1732, 1743 n. 15, 123 L.Ed.2d 387 (1993).

*Corp.,* 102 F.Supp.2d 1226, 1236 (D.Kan. 2000) (citations omitted). It "relates to the avoidance of a specific collision." *Armstrong v. Atchison, Topeka & Santa Fe Ry. Co.,* 844 F.Supp. 1152, 1153 (N.D.Tex.1994). A condition that can be or is present at many, or most sites cannot be a specific, individual hazard. *See, e.g., Earwood v. Norfolk S. Ry. Co.,* 845 F.Supp. 880, 888 (N.D.Ga.1993); *see also Bowman v. Norfolk S. Ry. Co.,* 832 F.Supp. 1014 (D.S.C.1993). Most courts have rejected plaintiffs' claims of a specific, individual hazard, finding instead that the circumstances are preempted.

396 F.3d 632, 640 (5th Cir.2005). It has been consistently emphasized that the kinds of conditions that could constitute a "specific individual hazard" are limited to transient conditions that could lead to an imminent collision, such as a child standing on the railway or a motorist stranded on a crossing or improperly parked tank cars which obstruct the view of the train engineer.[7] *See Seyler v. Burlington Northern Santa Fe Corp.,* 102 F.Supp.2d 1226, 1236 (D.Kan.2000).[8] In the case at bar, Baker submits that the work of the Hancock crew at the Greens Road crossing fits the definition of a specific, individual hazard, because in setting applicable speed limits, federal regulators obviously did not "account[ ] for the possibility of a two-day construction job involving truck-drivers re-

**7.** While some courts have regarded the "essentially local safety hazard" exception in the savings clause of 49 U.S.C. § 20106 and the "specific individual hazard" exception recognized by the Court in *Easterwood* as synonymous and have used the terms interchangeably, *see, e.g., Gunn v. Atchison, Topeka and Santa Fe Ry. Co.,* 13 S.W.3d 52, 54 (Tex.Ct. App.1999) (stating that "the 'a specific individual hazard' wording ... was used by the *Easterwood* court as a substitute for the statutory 'an excessively local safety hazard' language"), others have recognized these exceptions as distinct, *see, e.g., Stevenson v. Union Pacific R. Co.,* 110 F.Supp.2d 1086, 1088–1089 (E.D.Ark.2000) ("A 'specific, individual hazard' is not to be confused with the statutory 'essentially local safety hazard' set forth in 49 U.S.C. § 20106."); *Hightower v. Kansas City Southern Ry. Co.,* 70 P.3d 835, 846–47 (Okla.2003) (noting distinction). In this court's view, the Supreme Court's reference to an exception for specific, individual hazards clarified that in addition to, or as a facet of a state's right to regulate as to essentially local safety hazards, federal regulations do not diminish the train crew's duty to exercise reasonable care to slow or stop the train to avoid an imminent collision.

**8.** In *Seyler v. Burlington Northern Santa Fe Corp.,* 102 F.Supp.2d 1226, 1236 (D.Kan. 2000), cited approvingly by the Fifth Circuit in *Hesling,* the court gave examples of circumstances which had been found by courts to not constitute specific, individual hazards: *See Cox v. Norfolk and Western Ry. Co.,* 998 F.Supp. 679, 687 (S.D.W.Va.1998) (snow covered crossing); *O'Bannon v. Union Pac. R.R. Co.,* 960 F.Supp. 1411 (W.D.Mo.1997) (inadequate warning devices, grade/angle of crossing, proximity to highway), *aff'd,* 169 F.3d 1088 (8th Cir.1999); *Herriman v. Conrail Inc.,* 883 F.Supp. 303, 307 (N.D.Ind. 1995) (inadequate lighting at crossing); *Wright v. Illinois Cent. R.R. Co.,* 868 F.Supp. 183, 187 (S.D.Miss.1994) (vegetation, grade/angle of crossing, inadequate warnings); *Williams v. Alabama Great Southern R. Co.,* 1994 WL 419863, at *2 (E.D.La.1994) (presence of fog and brick facility); *Earwood v. Norfolk Southern Ry. Co.,* 845 F.Supp. 880, 888 (N.D.Ga.1993) (congested intersection, impaired visibility); *Armstrong v. Atchison, Topeka & Santa Fe Ry. Co.,* 844 F.Supp. 1152 (W.D.Tex.1994) (high traffic area without automatic gate and flashing light signals); *Bowman v. Norfolk Southern Ry. Co.,* 832 F.Supp. 1014 (D.S.C.1993) (same), *aff'd,* 66 F.3d 315 (4th Cir.1995); *but cf. Stone v. CSX Transp., Inc.,* 37 F.Supp.2d 789, 795–96 (S.D.W.Va. 1999) (repeated signal apparatus malfunctions at particular crossing constituted local hazard); *Bakhuyzen v. National Rail Passenger Corp.,* 20 F.Supp.2d 1113, 1117–18 (W.D.Mich.1996) (poor visibility due to snow constituted specific individual hazard).

peatedly driving across a crossing to dump vegetation and other debris removed from near the adjacent railroad track when they established the track classification." [9] *See Hightower v. Kansas City Southern Ry. Co.,* 70 P.3d 835, 847–48 (Okla.2003) (defining "specific, individual hazard" as "a person, vehicle, obstruction, object, or event which is not a fixed condition or feature of the crossing and which is not capable of being taken into account by the Secretary of Transportation in the promulgation of uniform, national speed regulations") (citations omitted). In the court's opinion, however, the mere fact of workers in proximity to the tracks whose work requires them to frequently traverse a public crossing in dump trucks cannot reasonably be said to be a specific individual hazard as contemplated by *Easterwood.* Simply put, this is "[a] condition that can be or is present at many sites" and thus is not a specific, individual hazard. *See Hesling,* 396 F.3d at 640. Indeed, as the Sixth Circuit recognized in *Ludwig v. Norfolk Southern Railway Co.,* 50 Fed.Appx. 743, 748, 2002 WL 31554085, 4 (6th Cir.2002),

> [C]onstruction at intersections is common and present around the country at many locations. Construction in the vicinity of the crossing is not the unique circumstance that the "specific, individualized hazard" exemption covers.

For these reasons, the court concludes that plaintiff's claim that the train was traveling at an excessive rate of speed in view of the Hancock crew's work is preempted and that plaintiff thus has no

viable claim in this regard, inasmuch as the train was traveling at a lawful rate of speed.

### 2. Alleged Negligence Based on Conditions of the Crossing

#### A. Inadequate Sight Distance

Among other things, plaintiff alleges that Illinois Central was negligent because he did not have enough sight distance down the track to see an approaching train. Defendant argues that plaintiff's claim fails as a matter of law for one or more of several reasons, namely, because (1) this claim is intimately connected with the work Baker and the Hancock crew were performing on the date of the accident; (2) it is undisputed that when Baker's dump truck was at the stop sign, the train was clearly visible; (3) it is undisputed that Baker never looked for an approaching train; and (4) photographs taken on the date of the accident show there were no obstructions on Illinois Central's right-of-way which could have prevented Baker from seeing an approaching train had he bothered to look.

#### i. Intimately Connected with the Work

As a general rule, "[t]he owner (or possessor) of a building (or premises) owes a duty to an independent contractor (and its employees) . . . to furnish a reasonably safe place to work or give warning of danger." *Buford v. Jitney Jungle Stores of America, Inc.,* 388 So.2d 146, 147–148 (Miss.1980) (quoting *Mississippi*

---

9. Though Illinois Central has cited numerous cases holding that alleged hazards such as limited sight distances, vegetation and overgrowth do not constitute specific individual hazards, *see, e.g., Stevenson v. Union Pacific R. Co.,* 2000 WL 1239737, *5 (E.D.Ark.2000), plaintiff undertakes to clarify in his response that he is not claiming that the condition of the crossing constituted a specific, individual hazard, and he purports to recognize that those conditions are not typically transient but rather more in the nature of a general condition of the crossing which the train speed regulations should cover. He emphasizes that his claim, instead, is that a slow order should have been issued in view of the work of the Hancock crew near and across the tracks.

*Chemical Corp. v. Rogers,* 368 So.2d 220, 222 (Miss.1979)). However,

> [a]s an exception to the general rule requiring the owner or occupier of premises (the contractee) to furnish a safe place of work to an independent contractor and the latter's employees, the owner or occupier is under no duty to protect them against risks arising from or intimately connected with defects of the premises, or of machinery or appliances located thereon, which the contractor has undertaken to repair. Closely related to this exception is the rule that the owner is not liable for death or injury of an independent contractor or one of his employees resulting from dangers which the contractor, as an expert, has known, or as to which he and his employees 'assumed the risk.'

*United Roofing & Siding Co. v. Seefeld,* 222 So.2d 406, 408 (Miss.1969). *See also Magee v. Transcontinental Gas Pipe Line Corp.,* 551 So.2d 182, 185 (Miss.1989)(stating that "where a party . . . contracts with another . . . to perform original construction or repair work . . . and devolves upon the contractor the right and fact of control of the premises and the nature and details of the work, the owner has no liabilities for injuries experienced by the contractor's workers where those injuries arose out of or were intimately connected with the work").

Illinois Central here submits that inasmuch as Hancock Construction and Baker were hired as independent contractors to remove vegetation and to improve the sight distance at Greens Road crossing, then Baker is foreclosed by the "intimately connected" exception from claiming that inadequate sight distance was a cause or contributing cause of the subject accident. The court concludes otherwise.

The exception on which Illinois Central relies is a premises liability concept, as it is an exception to a premises owner's duty to provide a safe place to work. Thus, the court is dubious as to the applicability of the general rule or the exception where the putative injury occurs off the owner's premises. *Cf. Stokes v. Emerson Elec. Co.,* 217 F.3d 353, 358 (5th Cir.2000) (concluding that "the exception applies only in instances in which the contractors' employees were injured while engaged directly in labor that was dedicated exclusively to the contractors' jobs and in the areas where those jobs must be performed"). Moreover, application of the exception is patently inconsistent with and inimical to the RWPR.

Here, Illinois Central has sought to avoid application of the RWPR on the basis that Baker, though admittedly engaged in the job he had been hired to perform at the time of his injury, was on a public roadway/crossing when the accident occurred and was no longer on the worksite. Accepting Illinois Central's position for the sake of argument, the court could not reasonably conclude that the "intimately connected" exception applies.[10] Put another way, if one were to conclude the injury occurred on the jobsite, then it would follow that RWPR applies, a conclusion which Illinois Central vigorously denies; and so far as the court is aware, there is no "intimately connected" or analogous exception to the RWPR.

Moreover, "[w]hile the general rule is that the owner of the premises does

---

**10.** Having said that, it is arguable that the "knowledge of danger" exception has more relevance, particularly given plaintiff's acknowledgment that he could potentially be charged with knowledge that the dirt and vegetation had not been fully removed when he traversed the crossing; but that exception has not been advanced by defendant and will not be addressed.

not have a duty to protect an independent contractor against risks arising from or intimately connected with the work, there is an exception where the owner maintains substantial de jure or de facto control over the work to be performed." *Coho Resources, Inc. v. McCarthy*, 829 So.2d 1, 13 (Miss.2002). Here, plaintiff maintains, and in the court's view correctly so, that Illinois Central retained control over the premises and/or over the nature and details of the work, as evidenced, in particular, by the fact that it continued to run its trains through the crossing at a time when the work was being performed. For this reason, as well, Illinois Central cannot successfully invoke the "intimately connected" exception.

### ii. *Visibility was not Impaired*

■ In support of its motion, defendant has presented the affidavit of an expert accident reconstructionist, Stephen Chewning, who reviewed photographs purportedly taken on the date of the subject accident, and states that when Baker's dump truck was located at the stop sign at the crossing, the "train was plainly visible, clear of any sight obstruction, and within hazard proximity of the crossing," such that Baker should have seen the train and yielded to the train.[11] *See* Miss.Code Ann. § 77-9-249 (setting forth duty of motorist to stop at crossing when train is approaching).

■ In response to defendant's motion, plaintiff points out that his experts have criticized Chewning's sight distance methodology and that there is otherwise substantial evidence that the crossing had inadequate sight distance. The court must agree. The fact is, questions as to whether and/or the extent to which visibility was compromised or obstructed at the crossing on the date and at the time of the incident cannot be resolved via summary judgment as the evidence on the issue is both voluminous and obviously contradictory.[12]

---

11. Chewning further states,

> [B]ased on my calculation of train speed and Plaintiff's vehicle positioning, when the Plaintiff's truck was located at the stop bar, the train was located 216 feet from the crossing, which is 17.5 feet clear of the tree line, south of the southernmost edge of the crossing.

He states that based on his personal observation of a freight train traveling northbound at the crossing,

> at approximately 216 feet, the train appeared huge, clear of the tree line, and dominated the sight distance picture.

12. The Mississippi Supreme Court has recently reiterated that

> [o]rdinary care requires the railroad company to meet the unusual conditions of a railroad crossing with unusual precautions, particularly where the dangerous condition results from obstructions of view which prevent a traveler from seeing an approaching train until he is dangerously close to the track. *New Orleans & Northeastern R.R. Co. v. Lewis*, 214 Miss. 163, 172, 58 So.2d 486, 489 (1952). The nature of the obstruction and whether one must come dangerously close to the crossing before being able to see the train are factual questions to be resolved by the finder of fact. *Badger v. Louisville & N.R. Co.*, 414 F.2d 880, 882–83 (5th Cir.1969).... [I]t has been held that negligence claims against a railroad that permitted the view at a crossing to become obstructed by trees, bushes, weeds and grass were matters for the jury to decide when a vehicle operator would have to proceed to a point of peril upon or dangerously near the railroad company's tracks before obtaining an unimpeded view of a train at an appreciable distance. *Stacey v. Illinois Cent. R.R.*, 491 F.2d 542, 544 (5th Cir. 1974).

*Illinois Cent. R. Co. v. Hawkins*, 830 So.2d 1162, 1170–1171 (Miss.2002) (additional citations omitted).

The court notes that the parties' respective experts have offered conflicting testimony and opinions as to whether sight obstructions existed at the crossing which would have impaired visibility of the approaching train. Defendant has moved to exclude plaintiff's ex-

### iii. *Causation*

Illinois Central argues, though, that even if there may have been inadequate sight distance at the crossing, Baker cannot establish that this proximately caused or contributed to the accident inasmuch as the proof shows that Baker never so much as bothered to slow, much less stop his truck, or to look to the right to make sure the way was clear before entering the crossing. For his part, Baker testified that he was unable to recall precisely what happened from the time he was told to move his loaded truck until his truck was hit by the train (though he did testify that it was his habit to stop and look).

The court would tend to agree that plaintiff's evidence of causation is weak, and that it may be difficult, if not ultimately impossible for plaintiff to prove that improved sight distance would have directly prevented the accident. The court is nevertheless hesitant to conclude that summary judgment is appropriate on this claim on this basis, particularly given that proof of inadequate sight distance is unquestionably relevant and will be admissible on the question whether the crossing was extra hazardous such that additional warnings were required.[13]

### B. *Extra Hazardous Crossing—Failure to Warn*

#### 1. *A Railroad's Common Law Duty to Warn*

 It has long been recognized that "a railroad has the (common law) duty where its tracks cross a public highway to exercise caution commensurate with the situation to avoid collisions with travelers on the highway, by some sufficient means of warning travelers of the presence of the train on its tracks." *Illinois Cent. R. Co. v. Brashier*, 224 Miss. 588, 595, 80 So.2d 739, 742 (Miss.1955). In this vein, because by their very nature, all railroad crossings involve some degree of danger, railroads operating in Mississippi are required by statute to erect crossbucks at all public railroad crossings. *See* Miss.Code Ann. § 77-9-247. This is the minimum warning required to be given of the presence of a crossing. However, where the crossing is "extra hazardous," or "unusually dangerous," the mere presence of a crossbuck would not necessarily prevent a collision, and a greater warning may be needed. In *Donald v. Gulf, M. & O.R. Co.*, 220 Miss. 714, 718–719, 71 So.2d 776, 777 (Miss. 1954), the court quoted 74 C.J.S., Railroads, § 711, p. 1306, where it was stated that " '[t]he test of whether a railroad crossing is unusually dangerous has been said to be the ability of the traveler to observe the approach of a train from the direction in which it is coming; * * * *'." Thus, Mississippi cases have long held that "if a crossing is unusually dangerous, ordinary care requires the railroad company to meet the peril with unusual precautions...." *Id.* (quoting 44 Am.Jur., Railroads, Section 507, page 747).

In the case at bar, plaintiff and his experts have taken the position that the subject crossing was "extra hazardous" and that Illinois Central was thus negligent in failing to install additional warning

---

perts' testimony on this issue (and other issues). In the court's opinion, defendant's motion should be denied and plaintiff's expert should be allowed to testify as to sight obstructions at the crossing.

**13.** Moreover, even assuming Baker made no affirmative effort to ensure the way was clear before entering the crossing, that would not necessarily be fatal to his claim if the RWPR were found applicable. He may have been entitled to rely on the railroad to provide him with specific protection at the crossing under the RWPR. In this vein, he did testify that he was accustomed on similar jobs to on-track safety being provided.

devices at the crossing.[14] Defendant submits that plaintiff cannot prevail on this claim because as a matter of law, it had no right or duty to install additional warning devices inasmuch as that duty is placed under the exclusive jurisdiction of the Mississippi Department of Transportation pursuant to Mississippi Code Annotated § 65–1–75. In the court's opinion, defendant's position in this regard is without merit. Section 65–1–75 provides, in pertinent part,

> The jurisdiction of the Mississippi Department of Transportation shall be exclusive with respect to public roadway/railroad crossings either at grade or otherwise except to the extent that its jurisdiction is preempted by valid federal statute, regulation or order.
>
> . . .
>
> The Mississippi Department of Transportation shall have power . . . to require the installation of adequate and appropriate luminous reflective warning signs, luminous flashing signals, crossing gates illuminated at night, or other warning devices in order to promote the health and safety of the public. Luminous flashing signals or crossing gate devices heretofore installed at grade crossings and those installations hereafter approved by the department shall be deemed adequate and appropriate. The department shall have authority to determine the number, type and location of such signs, signals, gates or other protective devices which shall conform as near as may be with generally recognized national standards, and the department shall have authority to prescribe the division of the cost of the installation and subsequent maintenance of such signs, signals, gates or other

warning devices between the rail carrier or carriers, the public highway authority in interest and the Mississippi Department of Transportation.

According to defendant, its duties with respect to warning devices were fully discharged once the crossbucks were installed, and thereafter, any determination or decision that the subject crossing needed additional warning devices fell within the exclusive jurisdiction of the Department of Transportation, which has never made any determination that the crossing was extra hazardous.

 While the statute does refer to the "exclusive" jurisdiction of the Department of Transportation, the court is of the opinion that the statute is properly interpreted as granting the Department exclusive jurisdiction vis-a-vis other state or local government authorities, not the railroads, and that it does not operate to relieve the railroad of its own common law duty to provide adequate warnings at crossings. *See Clark v. Illinois Cent. R. Co.,* 794 So.2d 191, 196 (Miss.2001) (recognizing railroad's common law duty to maintain safe crossing).

Similar arguments to that made by Illinois Central have been rejected by courts in numerous cases. For example, *Birmingham v. Union Pacific Railroad Company,* 971 F.Supp. 1282 (E.D.Ark.1997), involved a state statute which granted the Arkansas State Highway Commission "exclusive jurisdiction over, the location and construction of new, and the improving and protecting of new and existing, street, road, and highway railroad crossings in Arkansas." Based on that statute, the railroad argued that the plaintiff's inadequate warning claims should be dismissed

---

**14.** Defendant has moved to exclude plaintiff's experts' testimony regarding their opinion that the crossing was extra hazardous and the reasons therefor. Those motions are addressed *infra,* pp. 818 – 23.

as superseded by the statute. The court concluded that the statute did not relieve the railroad company of its common-law duty to provide adequate warnings at abnormally dangerous railroad crossings. *Id.* at 1287.

The statute at issue in *Alcorn v. Union Pacific Railroad Company* granted the State Division of Motor Carrier and Railroad safety "exclusive power to determine and prescribe the manner, including the particular point of crossing, and the terms of installation, operation, maintenance, apportionment of expenses, use and warning devices of each crossing of a public road, street or highway by a railroad or street railroad...." 50 S.W.3d 226, 235 (Mo.2001) (en banc). The court found no merit to the railroad's argument that the statute relieved it of any independent legal duty to evaluate a crossing to determine whether additional warning devices are needed, stating,

> Contrary to Union Pacific's reading, the "exclusive power" provision has traditionally been interpreted to "supplement, not repeal existing law." ... Union Pacific reads "exclusive power" out of context to mean that the division alone—to the exclusion of all others, including the railroad—is vested with the authority to determine whether certain railroad crossing warnings are required. The "exclusive power" of the division of motor carrier and railroad safety is to the exclusion of authority that might otherwise be exercised by municipal, county, Missouri Department of Transportation, or other authorities. Read in context, the statute ensures that there are "minimum standards" in the construction of a crossing and a single regulatory source for construction standards and allocation of costs.

*Id.* at 234–35. The court observed that "[w]here the legislature intends to preempt a common law claim, it must do so clearly," *id.* at 235, and concluded that it had not done so there, for "[n]othing in the statute negates the railroad's common law duty to use reasonable care in providing adequate warning of railroad crossings," *id.* See also *Smith v. Chesapeake & Ohio Ry. Co.*, 778 F.2d 384, 388 (7th Cir. 1985) (despite Indiana statute which granted "exclusive power" to public service commission to declare any crossing dangerous or extra hazardous and to require installation of additional safety devices, court held that railroad had duty to provide additional warning signals if warranted and could be found guilty of negligence if it failed to seek approval for placement of additional signals); *Shaup v. Frederickson*, 1998 WL 726650, *7 (E.D.Pa.1998) (court observed that while state statute vested Public Utilities Commission with exclusive power to determine the manner in which crossings will be maintained, operated and protected in the interests of public safety, "nothing in the text refers to a railroad's independent common law duty to make the crossing safe for travelers"); *Schulz v. Chicago, M., St. P. & P. Ry. Co.*, 260 Wis. 541, 545, 51 N.W.2d 542, 545 (Wis.1952) (stating that "[b]y giving the commission jurisdiction over the field the legislature did not abolish the common law duty of the railroad to take such additional precautions as the exercise of due care required until such time as the commission might exercise its jurisdiction over a particular crossing"); *cf. CSX Transp., Inc. v. Easterwood*, 507 U.S. at 665 n. 5, 113 S.Ct. 1732, 123 L.Ed.2d 387 (opining in dictum with respect to Georgia law that "[w]hile final authority for the installation of particular safety devices at grade crossings has long rested with state and local governments, ... this allocation of authority apparently does not relieve the railroads of their duty to take all reasonable precautions to maintain grade crossing safety ... including,

for example, identifying and bringing to the attention of the relevant authorities dangers posed by particular crossings.").

### 2. *Motion to Exclude Plaintiff's Experts*

 Expert testimony may properly be admitted as to the question whether a particular crossing is extra hazardous. *See Young v. Illinois Central Gulf R.R. Co.*, 618 F.2d 332, 337 (5th Cir.1980) (finding error in trial court's exclusion of expert's opinion concerning dangerous condition of crossing). In *Illinois Central Railroad Co. v. White*, 610 So.2d 308 (Miss.1992), the court rejected an argument that the trial court had improperly admitted the testimony of two experts who had stated that a crossing was extra hazardous and given the reasons for that conclusion.

> In this case, the experts testified that the railroad crossing was extra hazardous (or dangerous) because of the proximity of the crossing to the curve and the trestle over the ravine. This is not ·the ultimate issue. The ultimate issue which the jury resolved was whether or not the railroad was negligent in not doing more to warn of its impending approach of trains at the White's crossing. The expert testimony that the crossing was "extra hazardous" merely assisted the trier of fact in this regard.

*Id.* at 319–320. In support of its conclusion, the court cited its earlier opinion in *Wilner v. Mississippi Export Railroad Co.*, 546 So.2d 678 (Miss.1989), in which expert opinion that a crossing was extra hazardous had also been admitted. In *Wilner*, however, the court made clear that

> [t]he opinion of the expert that the crossing was extra hazardous does not end the inquiry. Every railroad crossing can be extra hazardous, and is potentially dangerous. Motorists tend to forget it, but driving an automobile is potentially dangerous. Some would state that living is dangerous. The question is whether the defendant railroad, considering the danger of the crossing, should have in the exercise of reasonable care placed more or different warnings than it did?

*Id.* at 681–682.

James R. Loumiet, one of plaintiff's experts, has testified that the subject crossing was extra hazardous based on the following factors:

1. Use of the crossing by high speed trains and large trucks;

2. Sight obstructions at the crossing;

3. Significant volumes of train traffic;

4. Transport of hazardous materials through the crossing by rail;

5. Significant accident history; and

6. Lack of active warning devices at the crossing.

Another of plaintiff's experts, Edward Stanton, has also given his opinion that the crossing was extra hazardous given the significant accident history and sight obstructions at the crossing.[15]

Defendant has moved to exclude Loumiet's testimony, arguing that his opinion that the subject crossing was extra hazardous is not based upon relevant data, and

---

**15.** Stanton gave as an additional basis for his conclusion that the crossing was extra hazardous the fact that the roadway approach to the crossing was elevated. It is undisputed, however, that the approach was not elevated. Stanton's opinion in this regard was based on photographs which he evidently misperceived to show an elevation when none existed. Obviously, if he had testified that the crossing was extra hazardous for this reason alone, his testimony would not be admissible. His conclusion, though, was also based on other factors, and to that extent, is admissible. *See supra* note 12, and *infra* pp. 816 – 17.

therefore is unreliable under *Daubert* and hence inadmissible. Specifically, it contends that because Loumiet has essentially admitted that the factors upon which he based his conclusion that the crossing was extra hazardous did not cause or contribute to this particular accident, those factors are irrelevant, and his opinion based thereon is consequently unreliable.

In response, plaintiff denies that the factors cited by Loumiet did not play a causal role in the accident at issue, but submits that even if they were not causal factors in this specific collision, that would not undermine the relevance and reliability of Loumiet's testimony in the least, because, according to plaintiff, the factors Loumiet uses to determine whether a crossing is extra hazardous, and thus whether additional precautions should have been taken by defendant prior to the accident, "are relevant irrespective of whether any of those factors played a role in the actual collision." In this vein, Mr. Loumiet testified that in evaluating the crossing, he was

> looking at the operational conditions of the crossing prior to the accident... not the accident itself per se.... In other words, the circumstances of this accident don't determine whether this crossing was safe or not.

The courts that have addressed this issue have rather consistently recognized that "any 'condition' affecting the danger of a crossing may be considered ... in determining whether the crossing is extrahazardous." *Crewdson v. Burlington Northern R. Co.,* 234 Neb. 631, 640, 452 N.W.2d 270, 279 (Neb.1990). As one court put it, "[w]hether or not a crossing is extra hazardous depends upon its physical characteristics and conditions relating to the crossing itself. This includes anything which would obstruct visibility, heavy traffic which would pose an unusual problem, or similar circumstances." *Ku-*

*per v. Chicago and North Western Transp. Co.,* 290 N.W.2d 903, 907–908 (Iowa 1980). Countless cases have so held. *See, e.g., Smith v. Chesapeake & Ohio Ry. Co.,* 778 F.2d 384, 386–387 (7th Cir.1985) (affirming charge to jury which instructed that it could consider "all other circumstances concerning the crossing, such as obstructions to view, if any, the nature and gradation of the terrain immediately adjacent to the crossing, the angle at which the tracks intersect the highway, the time of day, the speed of the train, the near situation of trees, vegetation and the like, the curves in the track, and the frequency with which travelers pass over the crossing"); *Hostetler v. Consolidated Rail Corp.,* 123 F.3d 387, 393 (6th Cir.1997) (relevant considerations in assessing what would constitute a reasonable and timely warning include such circumstances as "the amount and character of vehicular and other travel over the crossing, the extent and character of train movement, the control and speed of trains, and the character of the highway and the crossing itself"); *Crewdson,* 234 Neb. at 640, 452 N.W.2d at 278 (approving consideration of "the approaches to the crossing, the condition of the approaches, the obstructions, if any, to the view of the crossing to a traveler approaching the intersection, the amount of traffic using the crossing and all other relevant facts and circumstances which, in the exercise of ordinary care, would require active warning signals"). Indeed, the Mississippi Supreme Court has held, albeit in the context of a private crossing, that these same kinds of factors are properly considered in evaluating whether a crossing is extra hazardous. *See Illinois Central R.R. Co. v. White,* 610 So.2d 308, 317 (Miss.1992) (noting testimony concerning limited sight distance due to proximity of curve in the tracks and heavy vegetation, and volume of train and vehicular traffic over the crossing).

■ From this, the court must conclude that defendant's objection to Loumiet's testimony on the basis that his conclusion takes into account conditions of the crossing that did not directly cause this particular accident is not well taken.[16] Of course, in addition to proving that the crossing was extra hazardous, plaintiff must also prove that the warning provided by defendant in addition to the crossbuck-including the stop sign and the train's bell or whistle-did not constitute a reasonable warning on the occasion in question of the approach of the train, and he must show that the failure to provide a reasonable warning proximately caused or contributed to this collision.[17]

### 3. *Motion to Exclude Defendant's Experts*

■ In a related vein, plaintiff has moved to exclude defendant's experts' opinions that the crossing was *not* extra hazardous because they have not demonstrated that they have the requisite qualifications to give opinions on this subject and because they have not demonstrated that they considered any of these relevant factors in arriving at their conclusions. In

**16.** The court notes, however, that Loumiet's explicit reliance on 23 C.F.R. § 646.214 as a basis for concluding the crossing was extra hazardous is problematic. That regulation provides in pertinent part as follows:

> (3)(i) Adequate warning devices, under § 646.214(b)(2) or on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when one or more of the following conditions exist:
> (A) Multiple main line railroad tracks.
> (B) Multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.
> (C) High Speed train operation combined with limited sight distance at either single or multiple track crossings.
> (D) A combination of high speeds and moderately high volumes of highway and railroad traffic.
> (E) Either a high volume of vehicular traffic, high number of train movements, substantial numbers of schoolbuses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions.
> (F) A diagnostic team recommends them.

While the factors delineated in the regulation have been identified by courts as relevant to the inquiry whether a crossing is extra hazardous so as to give rise to a common law duty to provide enhanced warning of a crossing and/or train approach, the fact that the federal government mandates specific warning devices when any one of these conditions exists if federal funds are to be used at the crossing could be misleading and is for that reason potentially prejudicial. Thus, while Loumiet would not be foreclosed from testifying that these factors were considered, it may be appropriate to limit the extent of his testimony relating to this section. The court need not further consider at this time how to best address this potential prejudice.

**17.** Most courts have held that testimony regarding prior accidents at a crossing is admissible to show, among other things, that a dangerous situation or condition exists, provided that "the former accidents happened under substantially the same circumstances as those existing at the time of the accident." *Mitcham v. Illinois Central Gulf R.R. Co.,* 515 So.2d 852, 855–56 (Miss.1987). Here, plaintiff has identified three prior accidents at the crossing from 1995 to the date of the collision. The parties dispute whether all of those accidents are sufficiently similar to be relevant. Defendant argues that in order for evidence of other accidents to be admissible, Baker must prove that such accidents involved an eastbound commercial vehicle and a northbound train at a time when the vegetation had been cleared in the southwest quadrant of the crossing. Obviously, there were no such accidents, since the vegetation was not cleared until the date of the accident in issue. In the court's opinion, defendant's view as to what is required here is overly restrictive. Prior accidents at the crossing are relevant if they involved an eastbound vehicle and a northbound train during the daytime.

the court's view, having considered the parties' submissions, Chewning appears adequately qualified to provide his opinion on this issue, subject, of course, to cross examination as to the factors that inform his opinion as to the relative safety of the crossing. Defendant advises that it does not intend to offer "expert" opinion from McDonald regarding this issue, though it submits that he may properly offer lay testimony as to his impression whether the crossing could be safely traversed. It does not appear to the court that such testimony would be helpful to the jury, and should therefore not be permitted.[18]

*Conclusion*

Based on the foregoing, it is ordered that defendant's motion for summary judgment, or in the alternative, for partial summary judgment is denied; plaintiff's motion for partial summary judgment is denied; defendant's motion to exclude testimony of plaintiff's expert Edward Stanton is granted in part and denied in part, as set forth herein; defendant's motion to exclude the testimony of plaintiff's expert James R. Loumiet is denied; plaintiff's motion to exclude certain testimony from defendant's expert Mike McDonald is granted; and plaintiff's motion to exclude certain testimony from defendant's expert Stephen Chewning is granted in part and denied in part.[19]

---

18. For the same reason, the court is of the opinion that Chewning's proposed testimony that Baker could have heard the train whistle/bell from the cab of his truck on the occasion of the accident should not be allowed. Defendant concedes that Chewning cannot offer an expert opinion on this issue, and yet it proposes that he can offer lay testimony to that effect. The court concludes otherwise.

19. The plaintiff has previously filed a motion in limine that is fully briefed, and in recent days, additional motions in limine have been filed by defendants, some of which cover much of the same grounds as the motions considered herein. Those motions obviously are not addressed herein.