Monica Ensley Partenfelder, Plaintiff,

Managed Health Services Insurance
Corp./Healthcare Recoveries, Inc.,
Involuntary-Plaintiff,

Scott Partenfelder,
Plaintiff-Appellant-Cross-Respondent,

v.

Steve Rohde, Defendant-Respondent,†

Soo Line Railroad Company,
Defendant-Respondent-Cross-Appellant.

League of Wisconsin Municipalities
Mutual Insurance, Involuntary-Plaintiff,

Cyndi Krahn and John Krahn, Plaintiffs-
Appellants-Cross-Respondents,

v.

Steve Rohde, Defendant-Respondent,

Soo Line Railroad Company,
Defendant-Respondent-Cross-Appellant.

Court of Appeals

*No. 2012AP597. Oral argument January 10, 2013.
—Decided March 19, 2013.*

2013 WI App 48

† Petitions for Review filed.

(Also reported in 830 N.W.2d 115.)

On behalf of the plaintiffs-petitioners-appellants-cross-respondents, the cause was submitted on the combined briefs of *Victor C. Harding* of *Warshafsky, Rotter, Tarnoff, Bloch SC*, Milwaukee and *Robert D. Crivello* of *Cannon & Dunphy, S.C.*, Brookfield.

On behalf of the respondents-cross-appellants, the cause was submitted on the combined briefs of *Timothy R. Thornton* and *Jonathan P. Schmidt*, Minneapolis, Minnesota and *William H. Frazier* and *Melinda A. Bialzik* of *Godfrey, Braun & Frazier, LLP*, Milwaukee.

Before Curley, P.J., Kessler and Brennan, JJ.

¶ 1. BRENNAN, J. Scott Partenfelder,[1] along with Elm Grove Police Officer John Krahn and Officer Krahn's wife, Cyndi Krahn, appeal from the circuit court's order granting partial summary judgment to Soo Line Railroad Company and Steve Rohde, a Railroad employee.[2] Partenfelder and Officer Krahn were

---

[1] While only Scott and his insurer are named as plaintiffs in the amended complaint, the actions of Scott's wife, Monica Ensley-Partenfelder, play heavily into Scott's claims. To be clear, we refer to Scott as both "Scott" and "Partenfelder" throughout the opinion, but refer to Monica only as "Monica."

[2] The circuit court's order clarifying its summary judgment order dismissed Rohde from the case. Rohde has not joined the Railroad's cross-appeal.

both severely injured when a train hit the Partenfelders' van during the Elm Grove Memorial Day parade. The Plaintiffs argue that the circuit court erroneously concluded on summary judgment that the Federal Railroad Safety Act ("FRSA") preempted their negligence and safe-place claims to the extent those claims were based on allegations that the Railroad and Rohde had a duty to slow or stop the train because of the parade. The Railroad cross-appeals from the circuit court's summary judgment order, complaining that the circuit court erred when it denied the Railroad's motion for summary judgment because the undisputed facts show that the Railroad's crew took every available action to avoid impact once the crew saw the Partenfelders' van on the tracks. For the reasons which follow, we reverse the circuit court's summary judgment order on preemption, affirm the court's summary judgment order finding that the Plaintiffs' state a claim for relief, and remand for further proceedings consistent with this opinion.

## BACKGROUND[3]

¶ 2. On May 6, 2009, Elm Grove Police Sergeant Ryan Unger addressed a letter to Steve Rohde of the

---

[3] The parties had only completed discovery regarding the question of federal preemption at the time the circuit court addressed the Railroad's motion for summary judgment. As such, our background section is limited to those facts addressed by the parties on summary judgment. Those facts upon which the parties disagree are noted.

We also note that the statement of facts in the Railroad's brief, in many instances, failed to abide by the directive in Wis. Stat. Rule 809.19(1)(d), requiring the statement of facts contain "appropriate references *to the record.*" (Emphasis added.) The Railroad's many references to depositions, court orders by date, and unidentified "reports," while certainly more helpful than no citation at all, are not nearly as helpful to the court as the cites

Canadian Pacific Rail Police.[4] The letter informed the Railroad of Elm Grove's Memorial Day parade to be held on May 25, 2009, between 9:00 a.m. and noon. The letter specifically provided, in pertinent part:

RE: *SPECIAL EVENTS NOTIFICATION*

Dear Steve:

The Village of Elm Grove will once again celebrate Memorial Day with several activities, on our village grounds, . . . . Additionally, as in the past, a parade will commence at 10:30 AM on Monday, May 25th. It has been our experience in the past that pedestrian traffic increases greatly after 9:00 AM. The event tends to wind down near the 12:00 PM hour. . . .

Additionally, as this event continues to grow yearly, the increasingly larger crowds tend to utilize every inch of available space they can find. I assure you that we will have officers posted at both crossings that affect this event. These officers will attempt to control the crowd and vehicle movements. The affected crossings are:

1. Watertown Plank Road and Legion Drive.
2. Juneau Blvd.-13600 blk.

We are asking that you please make every attempt to notify your train conductors of the potential for pedestrian and vehicle hazards on the tracks, during the above listed times.

¶ 3. On May 15, 2009, Sergeant Unger sent a second copy of the letter to Rohde, and the Railroad admits in its answer to the complaint that Rohde

to the record required by the Rules of Appellate Procedure. We advise the Railroad to include all such record citations in any future documents to this court.

[4] Soo Line is a subsidiary of Canadian Pacific.

received the letter. After not hearing back from Rohde, Sergeant Unger called him on May 22, 2009. According to Sergeant Unger, Rohde told him that he had received the letters and placed a "look out order," asking conductors to decrease speeds and sound a bell when approaching the affected crossings. Rohde disputes telling Sergeant Unger that he told him that a look out order to decrease speeds would be placed, and contends that he does not have the authority to give such directives.

¶ 4. The order to the train crew the day of the parade, however, did not direct that the crew reduce speeds near the crossings affected by the parade. Rather, the order merely directed the crew to sound its bell continuously and to look out for crowds of people. According to the Railroad, a Railroad employee spoke with the parade director (who had not yet been deposed due to limited discovery prior to summary judgment), who told the Railroad it did not need to issue a slow order during the times set forth in Sergeant Unger's letter.

¶ 5. On the day of the parade, at about 9:30 a.m., Scott and Monica Partenfelder were travelling west on Juneau Boulevard to the parade. Scott was in one vehicle with two children, and Monica was following him in their van along with their two-year-old son who was strapped in his car seat in the back passenger side seat.

¶ 6. There was heavy traffic the morning of the parade, and, as the Partenfelders approached the railroad tracks from the east on West Juneau Boulevard, traffic came to a stop. Scott's vehicle had crossed one set of tracks and was straddling a second. The nose of Monica's vehicle was adjacent to the easternmost rail of the first set of tracks.

¶ 7. As the Partenfelders waited in traffic, the railroad crossing bells began to sound and flash and, a few seconds thereafter, the crossing gates came down.

The eastern crossing gate came down on the back of Monica's vehicle. Traffic began to move forward, but shortly thereafter again came to a halt. At this point, the parties agree that Scott's vehicle was off of the tracks, but appear to disagree as to whether Monica's van was on a track or between two sets of tracks.

¶ 8. Officer Krahn was stationed at the intersection of Juneau Boulevard and Elm Grove Road during the parade. He testified at his deposition that he observed Monica's vehicle "straddling the railroad tracks" and believed that she was on the main line that the train was travelling on. Monica could not move the vehicle forward or backward because of traffic.

¶ 9. Officer Krahn signaled Monica to maneuver her vehicle to the right side of Scott's rear bumper to the gravel shoulder, which Officer Krahn believed was the safest area. In attempting to do so, the right front tire of Monica's vehicle became trapped inside the westernmost rail. Her van was now facing the oncoming train.

¶ 10. Officer Krahn approached Monica's vehicle and proceeded to remove her from the driver's seat. Monica then informed Officer Krahn that her son was in the back seat. Officer Krahn and Scott both ran up to the sliding door of the van. While they were attempting to remove the Partenfelders' son from the van, the train struck and both Officer Krahn and Scott were seriously injured. Thankfully, the Partenfelders' son, who was strapped in his car seat, suffered no physical injury from the collision.

¶ 11. The crossing became visible to the train crew at approximately one-half mile, or less, because the train comes around a bend before the crossing becomes visible. The train engineer confirmed that both he and the train conductor observed "numerous

vehicles" on the tracks at the first sight of the crossing. In response, the railroad crew blasted the train's whistle. The crew hit the emergency brakes 348.48 feet before hitting the Partenfelders' van, and the train was travelling approximately 44.8 miles per hour at the moment of impact. The speed limit at the crossing for the train was fifty miles per hour.

¶ 12. An investigation of the accident verified that the Railroad fully complied with the applicable rules, time tables, and orders. Scott was ticketed for driving without a valid driver's license, and Monica was cited for failing to stop clear of the tracks; she admits to violating the law.

¶ 13. In March 2010, Partenfelder filed suit against the Railroad and Rohde,[5] asserting that their negligence was the cause of Partenfelder's injuries, and that the Railroad violated Wisconsin's safe-place statute.[6] *See* Milwaukee County Case No. 2010CV4313. Thereafter, in January 2011, Officer Krahn and his wife filed their own suit against the Railroad and Rohde,[7] alleging (as relevant to their appeal) that the Railroad and Rohde's negligence was the cause of Officer Krahn's injuries. *See* Milwaukee County Case No. 2011CV1010.

¶ 14. In February 2011, the Railroad and Rohde filed a motion for summary judgment on Partenfelder's complaint, arguing that Partenfelder's negligence and safe-place claims were preempted by the FRSA. In

---

[5] Partenfelder's complaint, which was later amended, also names several other parties whose interests are irrelevant for purposes of this appeal.

[6] Initially, Monica also joined in the suit, but later voluntarily dismissed all of her claims.

[7] The Krahns' complaint also names several other parties who we need not set forth because their interests are irrelevant to the Krahns' appeal.

October 2011, after both Partenfelder's and the Krahns' cases were consolidated for pretrial purposes, the Railroad and Rohde filed a second motion for summary judgment against the Krahns on similar grounds. They added, however, an argument that they were not liable for the accident as a matter of law because the evidence demonstrated that the Railroad complied with all federal regulations and that the Plaintiffs' negligence was the sole cause of their injuries.

¶ 15. The Plaintiffs all argued that their claims fit within an exception to FRSA preemption. Specifically, they argued that both the parade and persons or vehicles on a crossing, near a rail, or in between two warning gates are "specific, individual hazards" exempt from preemption. After considering the parties' arguments, the circuit court rejected the Plaintiffs' argument that the parade itself was a specific, individual hazard but found that the van on the railroad track *was* a specific, individual hazard. As such, the court concluded that the claims based upon the railroad crew's actions after spotting the van were exempt from preemption and denied the motions for summary judgment.

¶ 16. In January 2012, the Railroad and Rohde filed a motion for clarification. In the motion, the Railroad acknowledged the circuit court's conclusion that the van on the tracks, and not the parade, presented a specific, individual hazard, but argued that the Plaintiffs' theory of the case, as presented during a recent conference call with the court, was inconsistent with the circuit court's holding.

¶ 17. The Railroad and Rohde asserted that the case law defining a specific, individual hazard refers to unique occurrences, like a van on the tracks, not dangerous conditions, like a parade. As such, the Railroad and Rohde argued that the Plaintiffs' contention

that the Railroad and Rohde "should have known" that the possibility of the van on the tracks was likely and therefore that they had a duty to issue a slow order, was inconsistent with the court's summary judgment ruling. They complained that "[f]ailure to exclude such preempted arguments would enable [P]laintiffs to do indirectly what cannot be done directly: backdoor preempted evidence."

¶ 18. Meanwhile, the parties also asked the circuit court to clarify whether its summary judgment holding effectively dismissed Rohde from the case because the claims against Rohde were based on the fact that the City of Elm Grove had notified Rohde of the parade prior to the day of the accident.

¶ 19. Following briefing on the issues raised after summary judgment, the circuit court ruled as follows:

> At the previous hearing, the Court asked the parties whether it could dismiss Steve Rohde from this lawsuit, yet still admit the evidence at issue for purposes of determining when the duty to slow down or stop the train in the face of the Partenfelder vehicles arose. Defendants argued that such a result is impermissible under *Hightower v. Kansas City S. Ry. Co.*, 70 P.3d 835 (Okla. 2003). This Court agrees. After the court in *Hightower* determined that the plaintiff's claims for inadequate warning devices and excessive train speed were preempted, it excluded evidence pertinent to those theories on the issues of comparative negligence and punitive damages. *Id.* at 854. The *Hightower* court reasoned that the evidence was "part of the relevant state law substantially subsumed by federal regulations regarding railway safety and is thereby preempted." *Id.* at 852. Similarly, in this case, claims regarding parade-related conduct are preempted by the Federal Railroad Safety Act. Thus, evidence relating to the railroad's prior notice of the parade,

> failure to issue a slow order, and the crew's failure to hit the brakes prior to seeing the Partenfelder vehicles is inadmissible.

(Footnote omitted.)

¶ 20. Thereafter, the Plaintiffs filed a request with this court to appeal a non-final order, that is, the circuit court's summary judgment decision; the Railroad then asked for permission to cross-appeal. Both requests were granted.

## DISCUSSION

¶ 21. We address two issues on appeal. First, we consider the Plaintiffs' argument that the Railroad had a duty to issue a slow order because it knew the parade presented a danger and that claims dependent upon that duty are exempt from federal preemption. Second, we address the Railroad's argument that the evidence demonstrates that the Plaintiffs were the exclusive cause of their injuries, and that, therefore, the circuit court was required to grant the Railroad's summary judgment motion as a matter of law.

¶ 22. Our review of the circuit court's summary judgment decision is *de novo,* but we use the same method as the circuit court. *See Pinter v. American Family Mut. Ins. Co.,* 2000 WI 75, ¶ 12, 236 Wis. 2d 137, 613 N.W.2d 110. A party is entitled to summary judgment when there are no disputed issues of material fact and that party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2). In deciding whether there are factual disputes, the circuit court and the reviewing court consider whether more than one reasonable inference may be drawn from undisputed facts; if so, the competing reasonable inferences may constitute genu-

ine issues of material fact. *Hennekens v. Hoerl*, 160 Wis. 2d 144, 162, 465 N.W.2d 812 (1991). We draw all reasonable inferences from the evidence in favor of the nonmoving party. *Grams v. Boss*, 97 Wis. 2d 332, 338–39, 294 N.W.2d 473 (1980), *abrogated on other grounds by Meyers v. Bayer AG, Bayer Corp.*, 2007 WI 99, ¶ 28, 303 Wis. 2d 295, 735 N.W.2d 448. Whether an inference is reasonable and whether more than one reasonable inference may be drawn are questions of law that we review *de novo*. *Hennekens*, 160 Wis. 2d at 162. Keeping our standard of review in mind, we review each of the parties' concerns in turn.

## I. FRSA Preemption.

¶ 23. Congress enacted the FRSA to promote safety in every area of railroad operations and to reduce railroad-related incidents. 49 U.S.C. § 20101. The FRSA authorizes the Secretary of Transportation to "prescribe regulations and issue orders for every area of railroad safety." 49 U.S.C. § 20103(a). To prevent inconsistency in the laws across the country governing the railroads and to promote railroad safety, the FRSA has a preemption clause:

> **(a) National uniformity of regulation.—(1)** Laws, regulations, and orders related to railroad safety . . . shall be nationally uniform to the extent practicable.
>
> **(2)** A State may adopt or continue in force a law, regulation, or order related to railroad safety . . . until the Secretary of Transportation . . . prescribes a regulation or issues an order covering the subject matter of the State requirement . . . .

49 U.S.C. § 20106.

397

■

¶ 24. When considering whether a claim is preempted by a federal statute, we keep in mind that "the United States Supreme Court has 'long presumed that Congress does not cavalierly pre[]empt state-law causes of action.' " *Kriefall ex rel. Kriefall v. Sizzler USA Franchise, Inc.*, 2003 WI App 119, ¶ 28, 265 Wis. 2d 476, 665 N.W.2d 417 (citation omitted). As such, we start " 'with the assumption that the historic police powers of the [s]tates were not to be superseded by [a] [f]ederal [a]ct unless that was the clear and manifest purpose of Congress.' " *Id.* (citation and one set of quotation marks omitted).

¶ 25. Here, the Plaintiffs appear to concede that their negligence and safe-place claims are, at first glance, preempted by FRSA. However, the Plaintiffs argue that their claims are saved from FRSA preemption by an exception, recognized in *CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658, 675 n.15 (1993), for certain tort duties. The Railroad argues that *Easterwood* creates a new exception for specific, individual hazards that does not apply to the Plaintiffs' claims.

¶ 26. In *Easterwood*, the plaintiff filed a complaint against a railroad, claiming that the railroad "was negligent under Georgia law for [among other things] operating the train at an excessive speed." *Id.* at 661. The United States Supreme Court concluded that federal regulations had been adopted that addressed the maximum speeds at which trains are permitted to travel, preempting the plaintiff's excessive-speed claim. *Id.* at 674. However, the Court noted in a footnote that:

> Petitioner is prepared to concede that the preemption of respondent's excessive speed claim does not bar suit for breach of related tort law duties, *such as the duty to slow or stop a train to avoid a specific, individual hazard.* As respondent's complaint alleges only

> that petitioner's train was traveling too quickly given the "time and place," this case does not present, and we do not address, the question of FRSA's pre-emptive effect on such related claims.

*Id.* at 675 n.15 (record citations omitted; emphasis added).

¶ 27. Here, the circuit court found that the parade itself was not a specific, individual hazard set forth in *Easterwood*, but that the presence of the Partenfelders' van on the tracks was such a hazard. As such, the court prohibited allegations of negligence prior to the moment the Partenfelders' van first became visible to the train crew.

¶ 28. We conclude that: (1) *Easterwood* does not create a new exception, but rather, its reference to specific, individual hazards is merely an express recognition of the common law duty to slow or stop a train in the face of known hazards, an already-recognized exception to federal preemption; and (2) whether *Easterwood* recognizes an old exception or creates a new exception, the parade is a specific, individual hazard under that exception.

### A. *Easterwood* recognizes a previously established exception to FRSA preemption for negligence claims based upon a duty to slow down for known hazards.

¶ 29. The Plaintiffs first argue that *Easterwood* cannot be read to create a new exception to FRSA preemption for specific, individual hazards, but rather has to be read as referencing duties that already exist in case law as exceptions to preemption. As such, they argue that the Railroad had a duty to slow down after it was notified of the parade and that tort claims based on that duty survive FRSA preemption. We agree.

399

¶ 30. The plain language of *Easterwood* proves that the Plaintiffs are correct on this point: "Petitioner is prepared to concede that the pre-emption of respondent's excessive speed claim does not bar suit for breach of related tort law duties, such as the duty to slow or stop a train to avoid a specific, individual hazard." *Id.*, 507 U.S. at 675 n.15. From the context and language, it is clear that the United States Supreme Court was acknowledging that the petitioner was conceding a point of established tort law, the duty to slow or stop a train to avoid a specific, individual hazard. And from the Court's precise language, it is clear that "the duty to slow or stop a train to avoid a specific, individual hazard" was the Court's example of a non-preempted, established tort law duty.

¶ 31. Furthermore, the United States Supreme Court would not create a new exception to a federal statute in a footnote without fully discussing the parameters of that exception in the body of the opinion. That seems particularly true in *Easterwood*, where the Court otherwise states that the exception does not apply in the case and will not be addressed. As such, it is clear that the Court in *Easterwood* was merely acknowledging the existence of established tort law duties, such as the duty to slow or stop a train for known hazards, as exceptions to FRSA preemption, and did not create a new, previously unrecognized exception.

¶ 32. In support of their argument that the *Easterwood* footnote acknowledged an existing exception to federal preemption for certain tort laws, rather than created a new exception, the Plaintiffs point to *Florida East Coast Railway Co. v. Griffin*, 566 So. 2d 1321 (Fla. Dist. Ct. App. 1990). In *Griffin*, decided before *Easterwood*, the Florida state appellate court concluded that: (1) the railway had a duty to slow down for

dangerous conditions; and (2) claims based upon that duty were not preempted by FRSA. *Griffin*, 566 So. 2d at 1324. Directly addressing the issue of preemption, the Florida appellate court concluded as follows:

> We reject the appellants' contention that the [FRSA] has preempted consideration of negligent conduct of a railroad and its agents when faced with a dangerous condition or event, notwithstanding that the acts of negligence involve a failure to reduce speed below the maximum limit established by federal law. Certainly it was not the intent of the act to insulate railroads from liability for specific tortious acts in the face of hazardous conditions.

*Id.* (internal citations omitted).

¶ 33. We agree that *Griffin*'s holding supports our conclusion that tort law prior to *Easterwood* permitted an exception from FRSA preemption for known hazardous conditions, and that *Easterwood* merely acknowledges those cases. The fact that *Griffin* predates *Easterwood* by several years does not weaken the Plaintiffs' argument, but rather it strengthens it by showing an earlier expression of the exception. *See, e.g., Alcorn v. Union Pac. R.R. Co.*, 50 S.W.3d 226, 242 (Mo. 2001) (en banc) (citing *Griffin* as a case "that recognize[s the] exception to federal preemption based on a 'specific, individual hazard' ").

**B. Whether *Easterwood* creates a new exception or merely recognizes a previously established exception, the parade is a specific, individual hazard as defined in the case law preceding *Easterwood* and is therefore exempted from preemption.**

¶ 34. Neither the United States Supreme Court nor the Seventh Circuit Court of Appeals has defined a

401

specific, individual hazard, *see Anderson v. Wisconsin Cent. Transp. Co.*, 327 F. Supp. 2d 969, 977 (E.D. Wis. 2004), and the parties agree that there is no Wisconsin state case law on point. However, our federal district court in the Eastern District of Wisconsin defined a specific, individual hazard thusly in *Anderson*:

> a specific, individual hazard is a person, vehicle, obstruction, object or event which is not a fixed condition or feature of a crossing and cannot be addressed by a uniform, national standard. *See, e.g., Hightower*, 70 P.3d at 847. A specific individual hazard is a unique occurrence which could cause an accident to be imminent rather than a generally dangerous condition. *Id.* A commonly cited example is a child standing on a track. *See, e.g., Bashir v. Nat[iona]l R.R. Passenger Corp.*, 929 F. Supp. 404, 412 (S.D. Fla. 1996). "Factors such as general knowledge that a crossing is dangerous, traffic conditions, a crossing's accident history, sight distances, multiple crossings in close proximity, sun glare, a railroad's internal policies regarding speed, and inadequate signal maintenance are not specific, individual hazards." *Myers v. M[issouri]. Pac. R.R. Co.*, 52 P.3d 1014, 1028 (Okla. 2002).

*Anderson*, 327 F. Supp. 2d at 978 (footnote omitted).

■

¶ 35. Relying on the definition of a specific, individual hazard set forth in *Anderson*, the Plaintiffs argue that the circuit court erred in concluding that the parade itself was not a specific, individual hazard because the parade was a temporary "event" that, at that particular crossing, during the three hours the parade was going on, "could cause an accident" "to be imminent" if the train did not operate at a restricted speed. The Railroad counters that the parade only presented the *potential* for danger, and that the specific, individual hazard exception does not apply unless

there is *actual* imminent danger of the train colliding with a specific vehicle or object on the tracks. Moreover, the Railroad asserts that specific, individual hazards must be aberrations that cannot be practically addressed by uniform national standards, and a parade resulting in traffic congestion does not qualify as an aberration. As such, the Railroad asserts that the circuit court properly concluded that the parade was not a specific, individual hazard and that claims based on the parade are pre-empted. We agree with the Plaintiffs that, given the facts of this case, the parade was a specific, individual hazard, and therefore claims based upon the parade are excepted from federal preemption under the FSRA.

██

¶ 36. As *Anderson* sets forth, and the parties generally agree, "a specific, individual hazard is a person, vehicle, obstruction, object or event"[8] that: (1) "is not a fixed condition or feature of a crossing"; (2) "cannot be addressed by a uniform, national standard"; (3) "is a unique occurrence [that] could cause an accident to be imminent"; and (4) is *not* a generally dangerous condition. *Id.* at 978. The Elm Grove Memorial Day parade fits each of these criteria.

¶ 37. The parade, an event, was "a unique occurrence [that] could cause an accident to be imminent," *see id.*, in that, one day a year, for a few hours, the

_____

[8] The Railroad disagrees that an "event" can be considered a specific, individual hazard, arguing that because no event has ever been held to be such a hazard, any reference to an event as a specific, individual hazard is merely dicta. We need not resolve the debate here, because even if the Railroad's knowledge of the parade, an "event," is not a specific, individual hazard, the Railroad's knowledge of the numerous "people" and "objects," i.e., vehicles, that would be descending upon the track for the parade does qualify as a specific, individual hazard for the same reasons set forth above.

parade caused a substantial increase in traffic in the area around the railroad crossing. The railroad crossing was unique in its physical location as well. It crossed the Village's main road, near the park where the parade was to begin. The parade was "not a fixed condition or feature of [the] crossing," because, again, it occurred only once throughout the year, and as such it is difficult if not impossible to address the hazards created by the parade with uniform national standards. *See id.* Moreover, contrary to the Railroad's contention at oral argument, we conclude that the parade was not a generally dangerous condition akin to chronic bad traffic or frequent Brewers' games, because, again, the parade only occurred once a year.

¶ 38. The key to the specific, individual hazard exception to FRSA preemption is the unfixed nature of the event that creates the danger. Certainly, the policy behind promoting the free flow of interstate commerce necessitates preemption where train speed interruptions, if frequent, would impede commerce. Requiring trains to slow for every Brewers' game, for example, would contradict the policy. But where the event is "unique" or "a specific, individual hazard," even federal preemption must give way to public safety. Here, the Plaintiffs have presented sufficient evidence to demonstrate that the Railroad knew that the parade was occurring and that the parade could cause an accident to be imminent. As such, the Plaintiffs' negligence and safe-place claims based upon that knowledge are exempt from FRSA preemption. We reverse the circuit court's legal conclusions to the contrary.

## II. The Plaintiffs' complaint states a claim for relief.

¶ 39. In its cross-appeal, the Railroad admits that the van on the tracks created a specific, individual hazard. However, it argues that because the undisputed evidence allegedly demonstrates that the hazard resulted exclusively from Officer Krahn's and the Partenfelders' negligence, and that the crew of the Railroad took every available action to avoid impact, the exception does not save the Plaintiffs' claims.

¶ 40. As we set forth in more detail above, the Plaintiffs have sufficiently set forth claims based upon the Railroad's actions prior to the time when the train crew saw the Partenfelders' van on the tracks. The Plaintiffs' claims are not just that the train crew should have responded differently upon seeing the van, but that the Railroad, upon being notified of the parade, should have issued a slow order for the day and time of the parade requiring the train crew to slow down when approaching the crossing. Consequently, we conclude that the circuit court did not err in failing to grant the Railroad's motion for summary judgment in its entirety.

*By the Court.*—Order affirmed in part; reversed in part and cause remanded.

¶ 41. CURLEY, P.J. (*dissenting in part; concurring in part*). As to Part I of the Majority's opinion, I respectfully dissent. Perhaps chafing under the unfortunate result that correct application of the Federal Railroad Safety Act would bring, the Majority has adopted a definition of "specific individual hazard" that would allow the Plaintiffs' lawsuit to proceed in state court. However, I cannot agree with the Majority's

analysis because the "specific individual hazard" exception does not arise "unless and until there is imminent danger of the train colliding with the [approaching] vehicle." *See Van Buren v. Burlington N. Santa Fe Ry. Co.*, 544 F. Supp. 2d 867, 880 (D. Neb. 2008). As *Hightower v. Kansas City Southern Railway Co.*, 70 P.3d 835, 848 (Okla. 2003) explained, "[a] specific, individual hazard 'refers to a unique occurrence which could lead to a specific and imminent collision and *not to allegedly dangerous conditions at a particular crossing*.' " (citation omitted; emphasis in *Hightower*). The fact that a parade was scheduled during a time when a train would be passing by does not fit the definition; indeed, no court has ever found that a parade, by itself, gave rise to a specific, individual hazard. A parade that is scheduled at roughly the same date and time each year and that is well-known enough to draw a large crowd is not a "unique occurrence"—nor are baseball games, church fairs, or other similar events fitting this description. Rather, the parade in this case merely presented the potential for danger, *see id.*, and no specific individual hazard arose until the van stopped on the tracks. Consequently, I would affirm the trial court's ruling on this issue.

¶ 42. As to Part II of the Majority's opinion, I concur. Summary judgment on the plaintiffs' claims arising from the train crew's response to the Partenfelders' van, once it was on the tracks, is premature.