# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2012AP597 |
| COMPLETE TITLE: | Monica Ensley Partenfelder, |

Monica Ensley Partenfelder,
            Plaintiff,
Managed Health Services Insurance
Corp./Healthcare
Recoveries, Inc.,
            Involuntary-Plaintiff,
Scott Partenfelder,
            Plaintiff-Appellant-Cross-Respondent,
      v.
Steve Rohde,
            Defendant-Respondent-Petitioner,
Soo Line Railroad Company,
            Defendant-Respondent-Cross-Appellant-
Petitioner.

------------------------------------------------
League of Wisconsin Municipalities Mutual
Insurance,
            Involuntary-Plaintiff,
Cyndi Krahn and John Krahn,
            Plaintiffs-Appellants-Cross-
Respondents,
      v.
Steve Rohde,
            Defendant-Respondent-Petitioner,
Soo Line Railroad Company,
            Defendant-Respondent-Cross-Appellant-
Petitioner.

REVIEW OF A DECISION OF THE COURT OF APPEALS
347 Wis. 2d 385, 830 N.W.2d 115
(Ct. App. 2013 – Published)
PDC No: 2013 WI App 48

| | |
|---|---|
| OPINION FILED: | July 22, 2014 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | March 14, 2014 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Milwaukee |
| JUDGE: | Timothy M. Witkowiak |

JUSTICES:

CONCURRED:

DISSENTED:     ABRAHAMSON, C.J., BRADLEY, J., dissent. (Opinion
               filed.)

NOT PARTICIPATING:

---

ATTORNEYS:

For the defendant-respondent-cross-appellant-petitioner, there were briefs by *Timothy R. Thornton*, *Jonathan P. Schmidt*, and *Briggs and Morgan, P.A.*, Minneapolis, and *William H. Frazier*, *Melinda A. Bialzik* and *Godfrey, Braun & Frazier, LLP*, Milwaukee, and oral argument by *Timothy R. Thornton*.

For the plaintiffs-appellants-cross-respondents, there was a brief by *Robert D. Crivello* and *Cannon & Dunphy, S.C.*, Brookfield, and *Victor C. Harding* and *Warhafsky, Rotter, Tarnoff, Bloch, S.C.*, Milwaukee, with oral argument by *Robert D. Crivello*.

An amicus curiae brief was filed by *Beth Ermatinger Hanan* and *Gass Weber Mullins LLC*, Milwaukee, and *Daniel Saphire*, Washington, D.C., on behalf of the Association of American Railroads.

2

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2012AP597

(L.C. No. 2010CV4313 & 2011CV1010)

STATE OF WISCONSIN      :   IN SUPREME COURT

**Monica Ensley Partenfelder,**

   **Plaintiff,**

**Managed Health Services Insurance Corp./Healthcare Recoveries, Inc.,**

   **Involuntary-Plaintiff,**

**Scott Partenfelder,**

   **Plaintiff-Appellant-Cross-Respondent,**

  **v.**

**Steve Rohde,**

   **Defendant-Respondent-Petitioner,**

**Soo Line Railroad Company,**

   **Defendant-Respondent-Cross-Appellant-Petitioner.**

**FILED**

**JUL 22, 2014**

Diane M. Fremgen
Clerk of Supreme Court

-------------------------------------------------

**League of Wisconsin Municipalities Mutual Insurance,**

   **Involuntary-Plaintiff,**

**Cyndi Krahn and John Krahn,**

   **Plaintiffs-Appellants-Cross-**

Respondents,

  v.

Steve Rohde,

        Defendant-Respondent-Petitioner,

Soo Line Railroad Company,

        Defendant-Respondent-Cross-Appellant-
Petitioner.

---

REVIEW of a decision of the Court of Appeals. *Reversed in part, affirmed in part, and cause remanded.*

¶1 DAVID T. PROSSER, J.   This is a review of a published decision of the court of appeals[1] relating to the applicability of federal preemption under the Federal Railroad Safety Act (FRSA).

¶2 The FRSA and its accompanying federal regulations normally preempt state law claims relating to train speed. 49 U.S.C. § 20106 (2006). However, there are exceptions. One exception provides that regardless of the speed set by the federal regulations, federal preemption does not foreclose a lawsuit against a railroad for breaching the duty to slow or stop when confronted with a "specific, individual hazard." See

---

[1] Partenfelder v. Rohde, 2013 WI App 48, 347 Wis. 2d 385, 830 N.W.2d 115, reviewing a decision of the Milwaukee County Circuit Court, Timothy M. Witkowiak, Judge.

<u>CSX Transp., Inc. v. Easterwood</u>, 507 U.S. 658, 675 n.15 (1993). The question in this case is whether a parade and the resultant parade traffic qualify for the "specific, individual hazard" exception to preemption.

¶3 The case stems from a tragic collision between a train and a minivan during a Memorial Day parade in the Village of Elm Grove. Before the parade, the Elm Grove Police Department sent a letter to rail police officer Steve Rohde (Rohde) asking him to notify train conductors of potential hazards on the tracks near the parade. Rohde passed along the information, and Soo Line Railroad Company (Soo Line) issued an order for train crews to sound the engine bell and look out for potential hazards at the Elm Grove crossings. Unfortunately, a vehicle became stuck on the tracks, and while Elm Grove Police Officer John Krahn (Officer Krahn) and Scott Partenfelder (Scott) were trying to remove Scott's child from the car seat in the back of the vehicle, there was a collision in which the men were injured.

¶4 In two separate lawsuits that were eventually consolidated, Scott, Officer Krahn, and Officer Krahn's wife, along with their insurance companies, sued Soo Line, Rohde, and unknown insurance companies for negligence. The plaintiffs contended that Soo Line should have issued an order for trains to go more slowly through the Elm Grove crossings because the potential increase in traffic was a specific, individual hazard. The defendants disagreed and asserted that the FRSA preempted the plaintiffs' claims. Thus, the question for Wisconsin courts has been whether the Memorial Day parade falls under the

"specific, individual hazard" exception to preemption. See Easterwood, 507 U.S. at 675 n.15.

¶5 We conclude the following.

¶6 First, the Elm Grove Memorial Day parade was not a "specific, individual hazard" because the parade created only a generally dangerous traffic condition. Imminence and specificity are crucial components of the specific, individual hazard exception to preemption. See Armstrong v. Atchison, Topeka & Santa Fe Ry. Co., 844 F. Supp. 1152, 1153 (W.D. Tex. 1994); Hightower v. Kansas City S. Ry. Co., 70 P.3d 835, 847 n.21 (Okla. 2003). While the parade traffic in general may have increased the likelihood of an accident, it did not create a specific hazard, nor did the mere increase in traffic present an imminent danger of a collision. The parade traffic in this case is far afield of the paradigmatic specific, individual hazard of a child or vehicle stuck on the tracks in front of an oncoming train. Therefore, we reverse that portion of the court of appeals decision that concluded that the Elm Grove parade was a specific, individual hazard. In addition, we reverse the court of appeals decision to the extent that it alters the circuit court's dismissal of Rohde and to the extent that it alters the circuit court's decision to exclude evidence of Soo Line's prior notice of the parade, failure to issue a slow order, and failure to hit the brakes prior to seeing the vehicle on the tracks. See Hightower, 70 P.3d at 853-54.

¶7 Second, as Soo Line concedes, the vehicle on the tracks in front of the approaching train was a specific,

4

individual hazard. Thus, the question whether the train crew was negligent in responding to the vehicle stuck on the tracks remains, and we affirm that portion of the court of appeals decision that determined that the circuit court properly denied the defendants' summary judgment motion as it related to the claims regarding the train's reaction to the vehicle on the tracks.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

¶8 In 2009 the Village of Elm Grove's annual Memorial Day Parade took place on May 25. In anticipation of the parade, Sergeant Ryan A. Unger (Sergeant Unger) of the Elm Grove Police Department sent a letter dated May 6 to Steve Rohde, a member of the Canadian Pacific[2] Rail Police. The letter was titled "SPECIAL EVENTS NOTIFICATION" and said that Elm Grove would celebrate Memorial Day with a parade that would begin at 10:30 a.m. and end around noon on Monday, May 25, 2009. In the letter, Sergeant Unger stated that parade-related activities might increase pedestrian traffic into the afternoon. The letter asked Rohde to notify the conductors "of the potential for pedestrian and vehicle hazards on the tracks" at the Watertown Plank Road and Legion Drive crossing and at the Juneau Boulevard crossing. The letter did not ask for trains to be operated at reduced speeds.

---

[2] Soo Line is a subsidiary of Canadian Pacific Railway Company.

¶9 When Sergeant Unger did not hear back from Rohde, he sent an identical letter dated May 15 and followed up by calling Rohde on May 22. Sergeant Unger claims that during the conversation, Rohde said that he placed a lookout order to conductors for train crossings in Elm Grove.[3]

¶10 Rohde sent an email memo to inform dispatch[4] that Elm Grove was having a Memorial Day parade and that the Elm Grove Police Department asked that train crews be notified about the parade. One of dispatch's functions is to create a document called a Tabular General Bulletin Order (TGBO), which contains specific instructions for train operators and supersedes the

---

[3] Rohde disputes Sergeant Unger's version of events and claims that he has no authority to place a lookout order; only the dispatch center in Minneapolis could place that order. There is also dispute as to whether Rohde said he would ask for the trains to slow down. According to Sergeant Unger, Rohde said that he put out a lookout order advising conductors to decrease speeds and watch out for pedestrians. Rohde maintains that he never told Sergeant Unger that he would ask conductors to decrease their speed. In his email to dispatch, Rohde said only that the trains should sound their engine bells and be on the lookout for pedestrians.

Mark Fiereck (Fiereck), a superintendent of transportation who oversees dispatch, testified at his deposition that after he received Rohde's email, he called Rohde and asked for contact information for someone involved with the Memorial Day parade. According to Fiereck, he eventually spoke with a woman who was involved with planning the parade, and when he asked her if she wanted the trains to reduce their speed, she responded that she wanted only that they look out for pedestrians and ring the bell continuously.

[4] A "train dispatcher" is "a railroad employee who directs the movement of trains within a division and coordinates their movement from one division to another with other dispatchers." Webster's Third New International Dictionary 2424 (3d ed. 1986).

general requirements based on unanticipated events or conditions. The TGBO for the trains going through Elm Grove on the day of the parade said, "SOUND ENG BELL CONTINUOUSLY AND LOOKOUT FOR CROWDS OF PEOPLE WITHIN THESE LIMITS." The TGBO listed the limits as milepost 94.5 and 96.0, an area that included the Juneau Boulevard crossing where the accident occurred.

¶11 On May 25, 2009, Scott and Monica Ensley-Partenfelder (Monica) took their children to the Elm Grove Memorial Day parade. Scott and Monica took separate vehicles because their three children and the children's bicycles did not all fit into one. Scott was in front with the two older children; Monica was directly behind Scott in a 2000 Dodge Grand Caravan and had their 23-month-old son in her vehicle. Travelling west on Juneau Boulevard, Scott and Monica approached the Juneau Boulevard railroad crossing. There are two sets of tracks at the Juneau Boulevard crossing with 28 feet between them; trains going eastward travel on the westernmost tracks. When Scott and Monica came to the crossing, traffic stopped abruptly.

¶12 There are some inconsistencies in the accounts of what happened next. Monica said that she and Scott had been stopped at the tracks for a minute to a minute and a half when the crossing gate began to lower and the bells began to sound. She remembered that Scott was completely on the tracks and she was only partially on the easternmost tracks when the gate lowered onto the back of her van. An eyewitness said that the crossing gate came down on the roof of Monica's van but that the van was

still clear of the tracks.[5] Monica could not back up because there was a car close behind her. Monica said that traffic started moving again, and she followed Scott, who was able to drive clear of both sets of tracks.

¶13 Officer Krahn was at his assigned post roughly 150 feet west of the Juneau Boulevard crossing. When Officer Krahn heard the railroad crossing bell, he went to check the crossing and saw that there was a minivan straddling the tracks. Officer Krahn told the driver to move to an open gravel area to the right, but the right tire became stuck on the tracks. Officer Krahn told the driver to accelerate, which caused the vehicle to spin so that it was parallel to the tracks. The train crew applied the emergency brakes, but there was not enough track between the train and the vehicle for the train to stop before reaching the crossing. Officer Krahn physically extracted Monica from the vehicle and pushed her away from the tracks. Monica informed Officer Krahn that her son was in the back of the car, but Officer Krahn was unable to unlock the van's door. At that point, Scott arrived and unlocked the door; he then leaned in to unbuckle his son from the car seat. That is when the train struck the van. Monica went to the van after the collision and found that miraculously, her son was unharmed. However, Officer Krahn and Scott were injured in the collision.

---

[5] A claims representative for Canadian Pacific Railway Limited took measurements of the crossing and determined that the gate that came down on Monica's van was 22.5 feet to the east of the easternmost rail and 58.4 feet from the eastern rail of the tracks that the train was on.

¶14 Following the accident, Trooper Ryan J. Zukowski of the Wisconsin State Patrol—Technical Reconstruction Unit prepared a Reconstruction Report & Collision Analysis (Reconstruction Report) of the accident. The Reconstruction Report discusses details related to Soo Line and the train that collided with Monica's van. The Juneau Boulevard crossing is located at milepost 95.36, where the speed limit for a non-expedited freight train is 50 miles per hour. Between mileposts 93.7 and 96.6 there is a "continuous quiet zone" where trains may not use engine horns or bells unless there is an emergency. However, on May 25, 2009, the TGBO for the train that hit Monica's vehicle at the Juneau Boulevard crossing required the crew to sound the bell continuously and look out for people between mileposts 96.0 and 94.5 between 9 a.m. and 3 p.m. As the train entered the bell requirement area, it was travelling at a speed of 42.5 miles per hour, less than the speed limit of 50 miles per hour.

¶15 The train's Event Data Recorder (Recorder) "records information surrounding the train's operator inputs as well as speed-related and location data." The Recorder demonstrated that the train sounded the bell as required beginning at milepost 95.965. The train collided with the van at approximately 44.8 miles per hour[6] around 9:36 a.m. The

---

[6] The speed increase from 42.5 miles per hour to 44.8 miles per hour is a normal effect of emergency activation. An engineer on the train stated that he applied the train's emergency brakes when he saw Monica's van move onto the tracks.

Reconstruction Report concluded that both Juneau Boulevard and the railroad grade crossing were maintained satisfactorily, and the surrounding roads had the proper signage. The Elm Grove Police Department conducted an investigation of the crash and determined that the Soo Line train "was operating within Federal Railway Administration guidelines at the time of the event."[7]

¶16 On March 24, 2010, Scott and Monica filed a complaint in Milwaukee County Circuit Court. On July 27, 2010, Scott and Managed Health Services Insurance Corp./Healthcare Recoveries, Inc. as an involuntary plaintiff (collectively, "Partenfelder plaintiffs"), filed an amended complaint against Soo Line Railroad Company, AA Insurance Company (a fictitious name for an unknown insurance company), and Rohde.[8] The amended complaint alleged that Sergeant Unger's letter informed Rohde that increased parade traffic "would pose a unique local hazard" and asked Soo Line to take safety precautions. The complaint alleged that the defendants' negligence caused the collision of the train with Monica's van and that Scott suffered various injuries and expenses. In addition to the common law negligence

---

[7] After reviewing materials from its investigation, the Elm Grove Police Department issued a press release that stated that Monica would receive a citation for violating Wis. Stat. § 346.52(1)(i) (2009-10), which prohibits stopping "[w]ithin 25 feet of the nearest rail at a railroad crossing." In addition, the press release stated that Scott would be cited for operating a motor vehicle without a license contrary to Wis. Stat. § 343.44(1) (2009-10).

[8] Although Monica was originally a plaintiff, she was not a party to the amended complaint, and the court allowed her to be voluntarily dismissed on November 18, 2010.

10

claim against all defendants, the complaint brought a safe place claim[9] against Soo Line.

¶17 On November 29, 2010, Soo Line and Rohde filed a joint answer to the amended complaint and asserted various affirmative defenses, one of which was that federal law preempted the claims in the complaint.

¶18 On January 19, 2011, Officer Krahn and his wife, Cyndi Krahn (collectively, "Krahns"), and League of Wisconsin Municipalities Mutual Insurance as an involuntary plaintiff (collectively, "Krahn plaintiffs") filed a complaint in Milwaukee County Circuit Court against Soo Line, ABC Insurance Company (a fictitious name for an unknown insurance company), and Rohde. The complaint alleged that the collision between the Soo Line train and Monica's vehicle was caused by Soo Line's negligence in failing to reduce the train's speed in response to the alleged specific, individual hazard of increased traffic.

---

[9] Wisconsin Stat. § 101.11(1) (2009-10) provides:

Every employer shall furnish employment which shall be safe for the employees therein and shall furnish a place of employment which shall be safe for employees therein and for frequenters thereof and shall furnish and use safety devices and safeguards, and shall adopt and use methods and processes reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters. Every employer and every owner of a place of employment or a public building now or hereafter constructed shall so construct, repair or maintain such place of employment or public building as to render the same safe.

11

The complaint also alleged that the Soo Line crew was negligent for failing to look out and stop for the specific, individual hazard of Monica's vehicle on the tracks and for failing to apply the brakes as soon as the crew saw the vehicle.

¶19 Both cases were consolidated by a stipulation and order signed by all parties and filed on August 15, 2011. The consolidated cases proceeded in the Milwaukee County Circuit Court before Timothy M. Witkowiak, Judge.

¶20 In filings dated October 3, 2011, Soo Line and Rohde moved for summary judgment against the Krahn plaintiffs and filed a supplemental brief in support of a summary judgment motion that Soo Line and Rohde had filed on February 11, 2011, against the Partenfelder plaintiffs. In the briefs supporting the summary judgment motions, Soo Line and Rohde argued that the FRSA preempted all plaintiffs' claims. After a hearing on November 8, 2011, Judge Witkowiak denied the summary judgment motions against all plaintiffs in a written order filed January 19, 2012. On February 15, 2012, in a decision on a motion for clarification, the circuit court dismissed Rohde from the lawsuit and prohibited evidence of Soo Line's notice of the parade, the failure to issue a slow order, and any failure to brake before seeing the Partenfelder vehicles. The court reasoned:

> To hold [Rohde] liable for the injury that resulted from the "specific, individual hazard" identified by the Court is to impose a duty before the collision becomes imminent. Permitting this case to proceed against Steve Rohde allows Plaintiffs to back-door a

12

claim that is preempted by the Federal Railroad Safety Act.

¶21 In a subsequent written order on March 7, 2012, the court granted the motion for summary judgment as it related to Rohde and granted in part Soo Line's motion for summary judgment so that all claims relating to acts or omissions before the Juneau Boulevard crossing became visible to the crew were dismissed.

¶22 Scott and the Krahns filed a joint notice of appeal on March 21, 2012. On April, 4, 2012, Soo Line cross appealed those portions of the circuit court's order that were against Soo Line and that denied Soo Line's motions for summary judgment.

¶23 In a published decision, a divided court of appeals affirmed in part, reversed in part, and remanded the case to the circuit court. Partenfelder v. Rohde, 2013 WI App 48, 347 Wis. 2d 385, 830 N.W.2d 115. The court of appeals determined that the parade was a specific, individual hazard because it was a unique event that happened only once a year and "could cause an accident to be imminent." Id., ¶¶37-38 (quoting Anderson v. Wis. Cent. Transp. Co., 327 F. Supp. 2d 969, 978 (E.D. Wis. 2004)). Therefore, the court reversed the circuit court's decision regarding preemption.[10] Id., ¶38. The court of appeals affirmed the portion of the circuit court's decision that determined that the plaintiffs stated a claim for relief

---

[10] The court of appeals did not specifically address the claims against Rohde, but it appears as though the decision would allow those claims to be reinstated.

13

regarding the train crew's allegedly negligent response after seeing Monica's van on the tracks.   Id., ¶¶1, 39-40.   The dissent disagreed with the majority's conclusion on the preemption issue, reasoning that the parade presented only a "potential for danger" and was not a specific, individual hazard.   Id., ¶41 (Curley, P.J., dissenting in part, concurring in part).

¶24  Soo Line petitioned this court for review, which we granted on September 17, 2013.

## II. STANDARD OF REVIEW

¶25  This court reviews summary judgment decisions de novo but benefits from the analyses of the circuit court and court of appeals.  Yahnke v. Carson, 2000 WI 74, ¶10, 236 Wis. 2d 257, 613 N.W.2d 102.   A court shall grant summary judgment if the record demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Wis. Stat. § 802.08(2) (2011-12). "[W]hether federal preemption applies is a question of federal law that we review independently."   Blunt v. Medtronic, Inc., 2009 WI 16, ¶13, 315 Wis. 2d 612, 760 N.W.2d 396 (citing Int'l Ass'n of Machinists & Aerospace Workers v. U.S. Can Co., 150 Wis. 2d 479, 487, 441 N.W.2d 710 (1989)); see Miller Brewing Co. v. DILHR, 210 Wis. 2d 26, 33, 563 N.W.2d 460 (1997).

## III. DISCUSSION

¶26 The essential question in this case is whether the FRSA preempts claims that Soo Line should have slowed its trains because of the Memorial Day parade traffic.   The Supreme Court

14

has outlined three instances in which preemption occurs: (1) when Congress expressly sets forth a law's preemptive effect; (2) when there is a reasonable inference that the subject matter of the law in question is in a field in which Congress intended federal law to have exclusive application; and (3) when state law conflicts with federal law. English v. Gen. Elec. Co., 496 U.S. 72, 78-79 (1990). This case involves the FRSA's express preemption.

¶27 The FRSA was created "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101 (2006). To facilitate uniformity, the FRSA expressly preempts state law in areas covered by the FRSA:

> Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement.

49 U.S.C. § 20106 (2006).

¶28 FRSA preemption applies to state common law claims as well as statutory claims. Easterwood, 507 U.S. at 664. Although the FRSA expressly preempts state law in covered areas, it does provide an exception to preemption for "an essentially local safety or security hazard":

15

A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order——

(1) is necessary to eliminate or reduce an essentially local safety or security hazard;

(2) is not incompatible with a law, regulation, or order of the United States Government; and

(3) does not unreasonably burden interstate commerce.

49 U.S.C. § 20106 (2006) (emphasis added). In addition to this exception in the text of the FRSA, there is an exception to preemption for state claims alleging that a railroad was negligent for failing to slow or stop a train in response to a "specific, individual hazard."[11] Easterwood, 507 U.S. at 675 n.15.

---

[11] Courts have come to different conclusions as to whether a "specific, individual hazard" is part of the "essentially local safety or security hazard" exception to preemption listed in 49 U.S.C. § 20106 or whether it falls outside the scope of the FRSA. See Myers v. Mo. Pac. R.R. Co., 52 P.3d 1014, 1026 n.43 (Okla. 2002) (citing cases that disagree as to whether the essentially local safety or security hazard exception in 49 U.S.C. § 20106 is distinct from specific, individual hazards). We conclude that a specific, individual hazard is separate from the statutory local safety or security exception to preemption. This view is supported by CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 675 & n.15 (1993), where the Supreme Court determined that an excessive speed claim did not fall under the statutory "essentially local safety hazard" exception but suggested that a "specific, individual hazard" might place an excessive speed claim outside of FRSA preemption. The parties in this case frame their arguments in terms of a "specific, individual hazard" exception; therefore, we will not address the elements of the "essentially local safety or security hazard" exception in 49 U.S.C. § 20106 (2006).

16

¶29 The FRSA requires the Secretary of Transportation (Secretary) to "prescribe regulations and issue orders for every area of railroad safety supplementing laws and regulations." 49 U.S.C. § 20103(a) (2006). Acting through the Federal Railroad Administration, the Secretary promulgates regulations that set forth maximum train speeds depending on the track class. See Easterwood, 507 U.S. at 673; 49 C.F.R. §§ 1.49(m), 213.9 (2008).

¶30 Federal regulations under the FRSA preempt state law only if they cover the same subject matter as the state law; that is, state law is preempted "only if the federal regulations substantially subsume the subject matter of the relevant state law." Easterwood, 507 U.S. at 664 (citation omitted). The Supreme Court has determined that 49 C.F.R. § 213.9(a) "cover[s] the subject matter of train speed with respect to track conditions . . . ." Easterwood, 507 U.S. at 675. "Thus, if a train is involved in an accident while traveling under the maximum speed prescribed by § 213.9(a), a state law claim based on excessive speed is preempted." Anderson, 327 F. Supp. 2d at 975.

¶31 However, as mentioned above, negligence claims based on a train's failure to slow or stop in the face of a "specific, individual hazard" fall outside preemption. E.g., Easterwood, 507 U.S. at 675 n.15; Anderson, 327 F. Supp. 2d at 975. It is undisputed that the Soo Line train involved in the collision was travelling under the prescribed speed limit, and there is no allegation of any violation of federal regulations. Accordingly, Scott and the Krahns (collectively, "respondents")

17

may pursue their claims that Soo Line should have slowed its trains in response to the parade traffic only if this court concludes that the Elm Grove Memorial Day parade was a specific, individual hazard that removed the claims from the ambit of preemption.

A. Defining "Specific, Individual Hazard"

¶32 The "specific, individual hazard" language originated in Easterwood where the Supreme Court considered whether the FRSA preempted a negligence claim based on a train's allegedly excessive speed.  Easterwood, 507 U.S. at 665, 675 n.15.  In Easterwood, a train struck and killed Thomas Easterwood as he was driving across a set of railroad tracks in Cartersville, Georgia.  Id. at 661.  His widow, the respondent, brought several claims against the railroad, including a claim for breaching the common law duty to operate the train at a safe speed.  Id.  The Court determined that "the speed limits must be read as not only establishing a ceiling, but also precluding additional state regulation of the sort that respondent seeks to impose on petitioner."  Id. at 674.  The Court rejected the respondent's argument that a common law speed restriction falls under the "essentially local safety hazard" exception but suggested that the FRSA might not preempt speed claims based on specific, individual hazards:

> Petitioner is prepared to concede that the pre-emption of respondent's excessive speed claim does not bar suit for breach of related tort law duties, such as the duty to slow or stop a train to avoid a specific, individual hazard.  As respondent's complaint alleges only that petitioner's train was traveling too quickly

18

given the "time and place," this case does not present, and we do not address, the question of FRSA's pre-emptive effect on such related claims.

Id. at 675 & n.15 (internal citations omitted).

¶33 Since Easterwood, courts have endeavored to define the parameters of the "specific, individual hazard" exception to preemption and generally have interpreted the exception narrowly. Veit, ex rel. Nelson v. Burlington N. Santa Fe Corp., 249 P.3d 607, 618 (Wash. 2011) (en banc). A Wisconsin federal district court offered the following definition:

> Generally speaking, . . . a specific, individual hazard is a person, vehicle, obstruction, object or event which is not a fixed condition or feature of a crossing and cannot be addressed by a uniform, national standard. See, e.g., Hightower, 70 P.3d at 847. A specific individual hazard is a unique occurrence which could cause an accident to be imminent rather than a generally dangerous condition. A commonly cited example is a child standing on a track. "Factors such as general knowledge that a crossing is dangerous, traffic conditions, a crossing's accident history, sight distances, multiple crossings in close proximity, sun glare, a railroad's internal policies regarding speed, and inadequate signal maintenance are not specific, individual hazards." Myers v. Mo. Pac. R.R. Co., 52 P.3d 1014, 1028 (Okla. 2002).

Anderson, 327 F. Supp. 2d at 978 (footnotes omitted) (internal citations omitted). The definition suggests that a specific, individual hazard: (1) is a unique,[12] particular danger rather than a "generally dangerous condition"; (2) poses a danger of an imminent collision; and (3) "cannot be addressed by a uniform,

---

[12] In this context, "unique" refers to occurrences that are unusual rather than one-of-a-kind.

national standard." Id. (citation omitted). These components of a specific, individual hazard are interrelated, and we discuss them in more detail below.

¶34 To fall under the specific, individual hazard exception, the hazard must, as the name of the exception indicates, be a specific rather than a general danger. Armstrong, 844 F. Supp. at 1153 ("The 'specific, individual hazard' identified by the Easterwood court logically relates to the avoidance of a specific collision."). In addition, the specific danger must pose the risk of an imminent collision. Hightower, 70 P.3d at 847 n.21 (citation omitted) (agreeing with courts that "have narrowly construed 'specific, individual hazard' as an 'avoidance of an imminent collision with a specific person or object'"). In keeping with the specificity requirement, a specific, individual hazard is something that is unique and could not have been taken into account by the Secretary when promulgating uniform, national standards. See Myers, 52 P.3d at 1027; Armstrong, 844 F. Supp. at 1152-53 (determining that a grade crossing without an automatic gate or flashing lights in an area of heavy traffic was not a specific, individual hazard in part because the Secretary took those conditions into consideration).

¶35 Relying on the Anderson definition quoted above in paragraph 33, the respondents attempt to characterize the parade as a unique "event" that "could cause an accident" with a parade attendee "to be imminent." The respondents fail to consider Anderson's definition in its entirety. The alleged hazard in

20

this case is more appropriately characterized as a traffic condition rather than an event.[13] The Memorial Day parade may have increased the danger of a collision generally by contributing to traffic congestion, but Anderson is clear that "generally dangerous condition[s]" and "traffic conditions" are not specific, individual hazards. Anderson, 327 F. Supp. 2d at 978.

¶36 Moreover, the idea that a specific, individual hazard is something that "could cause an accident to be imminent," id. (emphasis added), does not mean that a specific, individual hazard is any hazard that could, in a cosmic sense, lead to an imminent danger of an accident. Instead, that phrase must be considered in context: "A specific individual hazard is a unique occurrence which could cause an accident to be imminent rather than a generally dangerous condition." Id. (emphasis added) (citation omitted). Thus, imminence is related to a particular danger. Cf. Myers, 52 P.3d at 1027 n.45 (emphasis added) (agreeing with courts that "have concluded that the phrase specific, individual hazard was used in Easterwood to describe

---

[13] In fact, both complaints allege that the traffic is the specific, individual hazard. The Partenfelder plaintiffs' amended complaint alleges "that the pedestrian and vehicular traffic would pose a unique local hazard." The Krahn plaintiffs' complaint alleges "that the increased pedestrian and vehicular traffic would pose a specific, individual hazard." Although the complaints allege that the parade attracted the traffic, they refer to the traffic as the hazard, not the parade.

the avoidance of an imminent collision <u>with a specific person or object</u>").

¶37 For example, if the Elm Grove Police Department had called Soo Line and said that there was a van stuck on the tracks several miles ahead of the train, the van would have been a specific, individual hazard that could have caused an accident to be imminent as the train approached. The same is not true for traffic congestion. Even as a train approaches a crowded crossing, there is no imminent danger of a collision if motorists and pedestrians are following the law. Thus, even if an "event" can constitute a specific, individual hazard in some circumstances, neither the parade in this case nor its resultant traffic was such an event.

¶38 Perhaps because no case has determined that an event like a parade is a specific, individual hazard, the respondents analogize to a case in which the court determined that an obstructed view was a specific, individual hazard. <u>Mo. Pac. R.R. Co. v. Lemon</u>, 861 S.W.2d 501 (Tex. App. 1993). The analogy is strained, and it is worth noting that at least one case that used the "event" language has specifically rejected the reasoning in <u>Lemon</u>. <u>Myers</u>, 52 P.3d at 1027 n.45 (stating that although <u>Lemon</u> "may be justified in light of specific peculiarities in [its] fact pattern[]," the case did not "provide[] a sound rule of general applicability").

¶39 In <u>Lemon</u>, a train struck a vehicle and killed the driver at a railroad crossing where railroad cars were illegally parked to obstruct the view of both drivers and train operators.

22

Lemon, 861 S.W.2d at 508-09. In addition to the fact that illegally-parked train cars made the crossing less safe, the crossing also was unlit, had no warning device for drivers to alert them to a coming train, consisted of multiple tracks, was above the level of the road, and had a curved road leading to the tracks. Id. at 510. The train's engineer testified that he would have seen the driver's car sooner if the illegally-parked train cars had not been there. Id. at 509-10. The driver's estate, among others, brought several claims against the railroad including one for operating at an excessive speed. Id. at 508. The railroad appellants argued that the FRSA preempted the excessive speed claim. Id. at 509.

¶40 The court in Lemon determined that train cars that obstructed the train operator's view were parked in violation of an administrative code provision and that the engineer's "realization that his view of one side of the crossing was obstructed, coupled with his knowledge of this crossing, triggered a duty for [the engineer] to slow his train . . . ." Id. at 509-10. The court noted that the illegally-parked train cars were not something that the Secretary of Transportation took into consideration when setting train speed limits and constituted a specific, individual hazard. Id. at 510. Therefore, the excessive speed claim was not preempted. Id.

¶41 We agree with Myers that Lemon does not give a generally applicable rule. Lemon's reasoning is suspect because it relies in part on the engineer's knowledge that a crossing had dangerous features. See id. But see Easterwood, 507 U.S.

23

at 675 (stating that "§ 213.9(a) should be understood as covering the subject matter of train speed with respect to track conditions, including the conditions posed by grade crossings"); Anderson, 327 F. Supp. 2d at 978 (noting that general knowledge of a crossing's danger and the fixed features of crossings do not constitute a specific, individual hazard). Moreover, Lemon came closer to falling within the specific, individual hazard exception than the present case because the hazard in Lemon was a specific obstruction that the Secretary could not have taken into account. The railroad knew that the illegally-parked train cars would obstruct the view of approaching trains and vehicles, creating an imminent danger of a crash any time a train traversed the crossing while a car was approaching. In contrast, the parade traffic is more aptly categorized as a generally dangerous condition because unlike the illegally-parked train cars, the parade does not necessarily make the crossing less safe.

¶42 In addition to citing cases that attempt to define Easterwood's "specific, individual hazard" exception, the respondents cite a pre-Easterwood case to argue that railroads have a duty to slow their trains when they know of a temporary and specific hazard. See Fla. E. Coast Ry. Co. v. Griffin, 566 So. 2d 1321 (Fla. Dist. Ct. App. 1990). In Griffin, a train hit a child who tripped while trying to cross the railroad tracks. Id. at 1322. There was evidence that the railroad and the engineer operating the train knew that children commonly crossed the tracks at the spot of the accident. Id. The court

24

determined that the FRSA did not preempt claims relating to "specific tortious acts in the face of hazardous conditions." Id. at 1324. Thus, on retrial, the jury was allowed to consider the fact that the railroad did not issue a slow order and that the engineer did not slow down or stop when he saw the children. Id.

¶43 Based on Griffin, the respondents in this case suggest that the jury should be able to consider Soo Line's knowledge of the increased traffic due to the Memorial Day parade and its failure to issue a slow order. However, the persuasive value of the opinion from a Florida court of appeals is minimal given the fact that the Supreme Court subsequently addressed the issue. Griffin is an outlier because it does not require that a collision between a train and a specific hazard be imminent before the specific, individual hazard exception applies. We decline to follow the analysis in Griffin because it is no longer the applicable law.

¶44 In a decision more analogous to the present case, a U.S. District Court in Mississippi determined that a railroad did not need to slow its trains based on knowledge that construction workers would be working near the tracks and frequently crossing the tracks. Baker v. Canadian Nat'l/Ill. Cent. Ry. Co., 397 F. Supp. 2d 803, 814 (S.D. Miss. 2005). The plaintiff argued that the railroad should have issued a slow order in response to the workers' activities. Id. at 814 n.9. The court rejected the plaintiff's claim and concluded that "[i]t has been consistently emphasized that the kinds of

25

conditions that could constitute a 'specific individual hazard' are limited to transient conditions that could lead to an imminent collision, such as a child standing on the railway . . . ." Id. at 813. Therefore, the fact that the workers had to cross the tracks frequently was not a specific, individual hazard because such activity took place at many sites.[14] Id. at 814.

¶45 Similarly, events might cause increased traffic around railroad crossings all over the country, and trains have no duty to slow down for potential hazards unless the danger is imminent. See Bashir v. Nat'l R.R. Passenger Corp. (Amtrak), 929 F. Supp. 404, 412 n.5 (S.D. Fla. 1996), aff'd sub nom. Bashir v. Amtrak, 119 F.3d 929 (11th Cir. 1997) (declaring that "a claim of failure to maintain a slow speed to avoid potential hazards is simply another way of claiming that the train was traveling at an excessive speed given the track type, location, and conditions, which Easterwood precludes as preempted.").

---

[14] Respondents argue that Soo Line slows its trains when it knows that employees are working on the tracks and that it should do the same when it knows the public will be near the tracks. The fact that Soo Line slows its trains when it knows that workers will actually be on the tracks does not give rise to a duty for Soo Line to slow its trains when there is traffic that might cause vehicles to become stuck on the tracks. Respondents also argue that because in years past, Soo Line had slowed down its trains, it knew that the parade was a specific, individual hazard. However, because the specific, individual hazard exception asks whether a collision is imminent, Soo Line's past conduct is irrelevant. A plaintiff cannot use a railroad's past voluntary act of caution to circumvent preemption.

26

B. Practical Concerns

¶46 The court of appeals supported its determination that the parade was a specific, individual hazard by emphasizing that the parade occurred only once a year. Partenfelder, 347 Wis. 2d 385, ¶37. Because the parade happens only once a year, the court reasoned that it was unique and not a generally dangerous condition like traffic related to frequent sporting events. Id. Nonetheless, the fact that the parade is an event that happens only once a year and "could cause an accident to be imminent" in a broad sense is not sufficient to place it under the specific, individual hazard exception.

¶47 Under the analysis espoused by the court of appeals and the respondents, railroads would be captive to speculative letters alleging that yearly "events" could cause an imminent accident.[15] It is not clear what standards railroads would have to use to make the determination when an event rises to the level of a specific, individual hazard. Letters could come to the railroad asking for slow orders for events from birthday and graduation parties to family reunions, to races and marathons, all of which might happen only once a year. However, traffic created by once-a-year events might not be appreciably different

---

[15] Although it might seem clear, the concept of a unique event is far too manipulable to provide a workable standard. For example, if Elm Grove put on an Independence Day parade in addition to the Memorial Day parade, would each parade be a unique event? It is unclear whether we would look at the broad categorization——parades——or at the underlying holiday or cause for celebration to determine uniqueness. The same problem could arise with other themed events or concerts.

from traffic due to regularly held events like concerts, plays, farmers' markets, or sporting events.  As Amicus Curiae Association of American Railroads points out, regular events might even attract more traffic than unique events.  Thus, to carve out an exception for parade traffic would be to poke an arbitrary hole in preemption.  It may be a small hole at first, but arbitrary holes are subject to expansion as litigants attempt to wedge their claims into the exception.

¶48  If we were to accept the respondents' test, railroads would face the constant dilemma of either slowing their trains or risking prolonged litigation and potential liability.  Furthermore, encouraging trains to fluctuate their speeds might be dangerous.

> The safest train maintains a steady speed.  Every time
> a train must slow down and then speed up, safety
> hazards, such as buff and draft forces, are
> introduced.  These kinds of forces can enhance the
> chance of derailment with its attendant risk of injury
> to employees, the traveling public, and surrounding
> communities.

Track Safety Standards, 63 Fed. Reg. 33992, 33999 (June 22, 1998).  In fact, slowing a train down might not prevent an accident because "[t]he physical properties of a moving train virtually always prevent it from stopping in time to avoid hitting an object on the tracks regardless of the speed at which the train is traveling." Id.

¶49 The idea that increased traffic constitutes a specific, individual hazard is suspect in part because train crews may assume that drivers will stop safely rather than cross

28

a track when a train is approaching. See <u>Van Gheem v. Chicago &</u> <u>N.W. R.R. Co.</u>, 33 Wis. 2d 231, 243, 147 N.W.2d 237 (1967). Wisconsin Stat. § 346.52(1)(i) (2009-10) prohibits drivers from stopping "[w]ithin 25 feet of the nearest rail at a railroad crossing." Drivers must stop at the signal of a warning device at a railroad crossing and shall not cross the tracks when a train is approaching. Wis. Stat. § 346.44 (2009-10). Thus, even times of high traffic do not normally constitute a specific, individual hazard because traffic laws provide protection for motorists and facilitate the safe operation of trains.[16] Unfortunately, occasional accidents occur. Although our compassion extends to all involved in the collision in this case, we cannot allow our sympathies to alter our analysis. The FRSA preempts state claims, and the parade in this case does not fit within the exception for specific, individual hazards. To hold otherwise would disregard the FRSA's express preemption and create uncertainty and inefficiency for railroads.

¶50 In sum, the parade and its attendant traffic do not constitute a specific, individual hazard; instead, the circumstances of this case presented only a general danger of traffic congestion. A specific, individual hazard exists when there is a particular hazard that poses the risk of an imminent

---

[16] Although slowing trains might prevent some accidents, "Prevention of grade crossing accidents is more effectively achieved through the use of adequate crossing warning systems and through observance by the traveling public of crossing restrictions and precautions." Track Safety Standards, 63 Fed. Reg. 33992, 33999 (June 22, 1998).

29

danger of a collision under circumstances that the Secretary could not have taken into consideration when promulgating uniform, national regulations. Here, those circumstances did not arise until Monica's van was visible to the train crew. Therefore, the inquiry on remand must focus on the train crew's response once it saw Monica's van. See Hightower, 70 P.3d at 853-54 (footnote omitted) (citations omitted) (stating that when the FRSA preempts negligence claims, "evidence pertinent to such claims is likewise inadmissible when offered for purposes of proof of culpability").

## IV. CONCLUSION

¶51 We conclude the following.

¶52 First, the Elm Grove Memorial Day parade was not a "specific, individual hazard" because the parade created only a generally dangerous traffic condition. Imminence and specificity are crucial components of the specific, individual hazard exception to preemption. See Armstrong, 844 F. Supp. at 1153; Hightower, 70 P.3d at 847 n.21. While the parade traffic in general may have increased the likelihood of an accident, it did not create a specific hazard, nor did the mere increase in traffic present an imminent danger of a collision. The parade traffic in this case is far afield of the paradigmatic specific, individual hazard of a child or vehicle stuck on the tracks in front of an oncoming train. Therefore, we reverse that portion of the court of appeals decision that concluded that the Elm Grove parade was a specific, individual hazard. In addition, we reverse the court of appeals decision to the extent that it

30

alters the circuit court's dismissal of Rohde and to the extent that it alters the circuit court's decision to exclude evidence of Soo Line's prior notice of the parade, failure to issue a slow order, and failure to hit the brakes prior to seeing the vehicle on the tracks. See Hightower, 70 P.3d at 853-54.

¶53 Second, as Soo Line concedes, the vehicle on the tracks in front of the approaching train was a specific, individual hazard. Thus, the question whether the train crew was negligent in responding to the vehicle stuck on the tracks remains, and we affirm that portion of the court of appeals decision that determined that the circuit court properly denied the defendants' summary judgment motion as it related to the claims regarding the train's reaction to the vehicle on the tracks.

*By the Court.*—The decision of the court of appeals is affirmed in part, reversed in part, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶54 SHIRLEY S. ABRAHAMSON, C.J. *(dissenting)*. It is important that trains run on time, but it is more important that the people and property of the state be kept safe.

¶55 The public safety of the residents of Wisconsin and our established tort law designed to promote public safety in Wisconsin do not necessarily conflict with federal standards under the Federal Railroad Safety Act (FRSA), which "promote[s] safety in every area of railroad operations . . . ."[1]

¶56 Like the court of appeals, I recognize that the Federal Railroad Safety Act does not fully replace or supersede Wisconsin's tort law, which protects the residents of the state from injury.[2]

¶57 By its very terms, the Federal Railroad Safety Act does not completely preempt all claims arising from a motorist's collision with a train. The text of the Act is evidence that Congress did not intend to preempt all claims based in part on the Federal Railroad Safety Act. In areas long occupied by state law, there is a presumption against preemption "unless [preemption] was the clear and manifest purpose of Congress."[3]

---

[1] 49 U.S.C. § 20101.

[2] Partenfelder v. Rohde, 2013 WI App 48, ¶¶29-33, 347 Wis. 2d 385, 830 N.W.2d 115.

[3] Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947). See also Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996).

1

¶58 Although the Federal Railroad Safety Act does not preempt all state claims related to railroad safety, it clearly preempts some.

¶59 Section 20106 of the Federal Railroad Safety Act is entitled "Preemption." A state's authority to regulate railroad safety is displaced when the Secretary of Transportation "prescribes a regulation or issues an order covering the subject matter of the State requirement."[4] The Federal Railroad Safety Act grants the Secretary of Transportation broad authority to prescribe regulations and issue orders for railroad safety.

¶60 A state may adopt or continue in force an additional or more stringent law than provided in the Federal Railroad Safety Act as long as it "(A) is necessary to eliminate or reduce an essentially local safety or security hazard; (B) is not incompatible with a law, regulation, or order of the United States Government; and (C) does not unreasonably burden interstate commerce."[5]

¶61 The Federal Railroad Safety Act, 49 U.S.C. § 20106, authorizes States to adopt or continue in force more stringent requirements related to railroad safety as follows:

> (a) National uniformity of regulation.——(1) Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable.
>
> (2) A State may adopt or continue in force a law, regulation, or order related to railroad safety or

---

[4] 49 U.S.C. § 20106(a)(2).

[5] 49 U.S.C. § 20106(a)(2).

security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order——

(A) is necessary to eliminate or reduce an essentially local safety or security hazard;

(B) is not incompatible with a law, regulation, or order of the United States Government; and

(C) does not unreasonably burden interstate commerce.

(b) Clarification regarding State law causes of action.——(1) Nothing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party——

(A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), covering the subject matter as provided in subsection (a) of this section;

(B) has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries; or

(C) has failed to comply with a State law, regulation, or order that is not incompatible with subsection (a)(2).

(2) This subsection shall apply to all pending State law causes of action arising from events or activities occurring on or after January 18, 2002.

(c) Jurisdiction.——Nothing in this section creates a Federal cause of action on behalf of an injured party or confers Federal question jurisdiction for such State law causes of action.

3

¶62 The majority opinion recognizes that the Federal Railroad Safety Act does not preempt all tort claims against railroads,[6] yet treats the "specific, individual hazard" as the only tort claim that survives preemption and addresses only the issue of whether a "specific, individual hazard" existed in the instant case, despite the plaintiffs' assertion that other tort duties apply.[7]

¶63 On the contrary, in CSX Transportation, Inc. v. Easterwood, 507 U.S. 658 (1993), the case the majority opinion cites for the "specific, individual hazard" exception, the United States Supreme Court acknowledged that preemption of an excessive speed claim under the Federal Railroad Safety Act "does not bar suit for breach of related tort law duties . . . ."[8] A "specific, individual hazard" is not to be confused with the preemption exception in § 20106(a)(2)(A) for an "essentially local safety or security hazard."[9]

¶64 Easterwood addressed whether a state wrongful death claim based on excessive train speed was preempted by federal regulations that set maximum allowable operating speeds for all freight and passenger trains for each class of track. The

---

[6] Majority op., ¶2.

[7] See Response Brief of the Plaintiffs-Appellants-Cross-Respondents at 3-4, 23-24 (stating there are multiple tort law duties that will defeat federal preemption including, but not limited to, slowing for a "specific, individual hazard.").

[8] CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 675 n.15 (1993).

[9] Dresser v. Union Pacific R.R. Co., 809 N.W.2d 713, 722 (Neb. 2011).

United States Supreme Court reasoned that these speed limits were adopted only after the hazards posed by track conditions were taken into account and that thus, all state law claims for excessive speed were subsumed by the regulations.[10]

¶65 A footnote in Easterwood noted that although the railroad was "prepared to concede" that the "pre-emption of [the] excessive speed claim [did] not bar suit for [its] breach of related tort law duties, such as the duty to slow or stop a train to avoid a specific, individual hazard," that issue was not presented and thus would not be decided by the Court. Easterwood, 507 U.S. at 675-76.

¶66 Wisconsin tort law's duty to exercise reasonable care can be violated even if the train speed limits set under federal law are being followed. The claim in the instant case relates to a circumstance that is not a fixed condition or feature of the railroad crossing. The local parade event could not have been taken into account by the Secretary of Transportation in the promulgation of uniform, national speed regulations under the Federal Railroad Safety Act. The plaintiffs' claim in the instant case is based on a unique occurrence that was likely to result in a collision, namely large numbers of cars and people would be on the tracks at a particular annual local event of which the railroad had been given notice.

¶67 I disagree with the majority opinion's implicit broad holding that the only state tort law claims that survive the Federal Railroad Safety Act are those that allege a "specific,

---

[10] Easterwood, 507 U.S. at 675.

5

individual hazard." Such an interpretation is contrary both to the federal statute and to our state's interest in protecting tort victims.

¶68 For the foregoing reasons, I dissent.

¶69 I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.